**STAR–KIST FOODS, INC.,**
Plaintiff-Appellee,

v.

**P.J. RHODES & COMPANY,**
Defendant-Appellant.

No. 84–5588.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 7, 1984.

Decided Aug. 28, 1985.

As Amended Sept. 19, 1985.

See also 735 F.2d 346.

Andrew Baum, Nims, Howes, Collison & Isner, New York City, for plaintiff-appellee.

Edward B. Gregg, Gregg, Caplan & Higgins, Menlo Park, Cal., for defendant-appellant.

Before KENNEDY and PREGERSON, Circuit Judges, and SOLOMON,* District Judge.

KENNEDY, Circuit Judge:

This is an action arising under the Lanham Act, 15 U.S.C. §§ 1051–1127 (1982), for trademark infringement and false designation of origin with respect to the ROSE BOWL trademark and the Bowl of Roses Design trademark (the trademarks). P.J. Rhodes & Company (PJR), a California corporation engaged in international trade, appeals from a judgment in favor of Star-Kist Foods, Inc. (Star-Kist), a California corporation engaged in the sale of canned fish. The trial court enjoined PJR from using the trademarks on canned fish sold within the United States or exported from the United States to either the Philippines or any other country in which PJR has not clearly established it's superior right of use. PJR contends the strongest evidence to support its case derives from its shipments to the Philippines from other foreign nations, and

---

\* Honorable Gus J. Solomon, Senior U.S. District Judge for the District of Oregon, sitting by desig-

nation.

accordingly cites as error the pretrial order limiting the scope of relief to sales within the United States or exports from the United States. We affirm in all respects.

PJR was appointed by Star-Kist's predecessors in 1948 as a distributor of ROSE BOWL products in the Philippines. Pursuant to an unwritten agreement, PJR would purchase canned fish either in the United States or abroad, primarily in Japan, and resell it in the Philippines. Resale was under the trademarks, with labels supplied by Star-Kist's predecessors. This informal relation continued when Star-Kist succeeded to ownership of the trademarks in 1980, and endured until Star-Kist terminated PJR's distributorship in a letter dated April 6, 1981. Shortly following receipt of the letter, PJR began selling canned fish in the Philippines under the trademarks, using labels that identified PJR instead of Star-Kist, as the source of the fish. PJR brought an action in the Philippine Patent Office to cancel Star-Kist's Philippine registration of the trademarks, and Star-Kist then commenced the instant proceedings in the district court to enjoin PJR's exportation of canned fish under the trademarks from the United States to the Philippines.

PJR contends the district court erred in granting Star-Kist's motion to limit the scope of relief to exclude evidence of wholly foreign commerce and to preclude adjudication of the right to use or register the trademarks in any country other than the United States. The district court, relying on *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 428–29 (9th Cir. 1977), concluded it lacked subject matter jurisdiction over claims involving wholly foreign commerce. As this is a question of law, we exercise *de novo* review over the district court's determinations. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied,* — U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). In *Wells Fargo* we concluded that the Lanham Act's coverage of foreign activities may be analyzed under the test for extraterritorial application of the federal antitrust laws set forth in *Timberlane Lumber Co. v. Bank of America National Trust*

*& Savings Ass'n,* 549 F.2d 597 (9th Cir. 1976) (*Timberlane I*). *Wells Fargo,* 556 F.2d at 427–28. In *Timberlane I* we held: first, there must be some effect on American foreign commerce; second, the effect must be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; and third, the interests of and links to American foreign commerce must be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority. 549 F.2d at 613–15.

■ The first and second requirements of the *Timberlane I* test, arguably, are satisfied here. With respect to the third element, however, we conclude PJR has not established that the interests of and links to American foreign commerce are sufficient to justify the extraterritorial application of the Lanham Act. *Compare Steele v. Bulova Watch Co.,* 344 U.S. 280, 286–87, 73 S.Ct. 252, 255–56, 97 L.Ed. 319 (1952) (the manufacture in the United States of components for defendant's falsely designated Bulova watches, assembled in Mexico and sold to Americans, created a significant impact upon American foreign commerce). The *Timberlane I* discussion of the third element of the test noted seven relevant factors:

> the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

549 F.2d at 614. We have held these seven factors should be balanced in each case. *Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n,*

749 F.2d 1378, 1384 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985) (*Timberlane II*); *Wells Fargo,* 556 F.2d at 428–29.

■ Here PJR's petition to cancel Star-Kist's Philippine registration of the trademarks is currently pending in the Philippine Patent Office. Application of the Lanham Act to wholly foreign Philippine commerce could create a conflict with Philippine patent and trademark law and with pending proceedings in that country. *See Wells Fargo,* 556 F.2d at 428–29 (the existence of a conflict with a foreign trademark registration weighs against extraterritorial application of the Lanham Act). *Compare Steele,* 344 U.S. at 285, 289, 73 S.Ct. at 255, 257 (plaintiff succeeded in cancelling defendant's Mexican trademark registration prior to the Court's decision, thereby avoiding a conflict with established foreign rights). Further, adjudication of the right to use the trademarks in Philippine commerce with nations other than the United States would require the testimony of Philippine nationals and the production and analysis of Philippine documents. The effect on United States commerce from the alleged illegal use of the trademarks in trade between the Philippines and other foreign countries is relatively insignificant compared to the effect on Philippine commerce. These factors indicate that the significant interest of the Philippines in restricting the extraterritorial application of the Lanham Act should preclude extension of the Act to wholly foreign commerce in this case. The other *Timberlane I* considerations do not mandate a contrary result. We conclude the district court acted in accordance with principles of international comity and fairness in excluding wholly foreign commerce from the Lanham Act case before it.

■ PJR next contends Star-Kist's predecessors abandoned the trademarks by failing to use them in the United States between 1974 and 1977. Under the Lanham Act, a trademark is abandoned when its use is discontinued with intent not to resume. 15 U.S.C. § 1127 (1982). Nonuse

for two consecutive years constitutes *prima facie* abandonment, *id.,* but this is a presumption that may be rebutted by showing valid reasons for nonuse or by proving lack of intent to abandon. *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1044 (2d Cir.1980). *Cf. Wallpaper Mfrs., Ltd. v. Crown Wall Covering Corp.,* 680 F.2d 755, 761 (C.C.P.A.1982) (abandonment of a trademark, being in the nature of a forfeiture, must be strictly proved); *Tillamook County Creamery Ass'n v. Tillamook Cheese and Dairy Ass'n,* 345 F.2d 158, 162 (9th Cir.) (no abandonment was established where plaintiff failed to prove defendant intended to abandon trademark), *cert. denied,* 382 U.S. 903, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965). The district court determined the trademarks were not abandoned. It found that Star-Kist's predecessors ceased using the trademarks in the United States during the period in question due to the unprofitability of importing fish into the United States, but that they intended to and did resume use of the trademarks when profits could again be made. This is a factual issue, well within the domain of the district court, and we conclude the district court's findings are not clearly erroneous.

■ PJR claims Star-Kist's predecessors also abandoned the trademarks by licensing them to PJR and then failing to exercise control over the quality of goods sold. It is well settled that one who licenses a trademark must retain control over the quality of goods sold by the licensee under the trademark. *Edwin K. Williams & Co. v. Edwin K. Williams & Co.-East,* 542 F.2d 1053, 1059 (9th Cir.1976), *cert. denied,* 433 U.S. 908, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977); *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 51 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972). The purpose of the rule is to protect the public from deception. *Williams,* 542 F.2d at 1059; *Siegel,* 448 F.2d at 51; *see also* 15 U.S.C. § 1055 (1982). The district court, however, found that the informal oral agreement between PJR and Star-Kist's predecessors did not confer upon

PJR the status of licensee or assignee. This finding is not clearly erroneous. The district court further determined there was no likelihood that the purchasing public would be confused regarding who produced the goods sold under the trademarks. *See* 15 U.S.C. § 1114(1) (1982); *see also International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 919 (9th Cir.1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). There is ample evidence in the record to support this finding as well. Though Star-Kist's predecessors turned over the printing plate for canned squid labels to PJR, all labels printed before April 6, 1981 identified Star-Kist as owner of the trademarks. It was only after Star-Kist terminated PJR's distributorship that PJR's name began appearing on export labels for squid and other canned fish.

█ PJR argues it acquired vested rights under the trademarks when it was given possession of the printing plate for squid labels. The district court determined PJR was never more than a distributor or sales representative for Star-Kist and its predecessors. This finding is amply supported by the record. Prior to Star-Kist's termination of PJR's distributorship, PJR consistently identified itself, both to its business contacts and to Star-Kist, as merely an authorized sales representative or official distributor of Star-Kist's products under the trademarks. Only after Star-Kist terminated the relation did PJR begin claiming vested rights under the trademarks.

█ PJR alternatively asserts it acquired vested rights under the trademarks based on Star-Kist's acquiescence in PJR's use of an imitation of the Bowl of Roses Design on labels for its own line of FARM ROSE canned fruits and vegetables. The district court determined this use created no likelihood of confusion with respect to the use of the trademarks by Star-Kist and its predecessors on canned fish, and, in consequence, was not infringing. We find no error in this assessment. *See* 15 U.S.C. §§ 1114(1), 1125(a) (1982). PJR never used

its imitation of the Bowl of Roses Design on canned fish, and Star-Kist and its predecessors never used the Bowl of Roses Design on any product other than canned fish. It was proper for the district court to determine that Star-Kist and its predecessors had neither the right to enjoin PJR's use of the design, nor the duty to impose quality control upon the fruits and vegetables sold under it. We find no error in the district court's determination that PJR did not acquire vested rights under the trademarks through its unopposed use of the imitation Bowl of Roses Design on FARM ROSE produce.

█ Finally, PJR contends Star-Kist's predecessors committed fraud on the Patent and Trademark Office by filing a false affidavit of use for the Bowl of Roses Design, and argues that Star-Kist's federal registration for the mark should be cancelled pursuant to 15 U.S.C. § 1064(c). Under the Lanham Act, an affidavit of use must be filed between the fifth and sixth year following registration of a federal trademark. 15 U.S.C. § 1058(a) (1982). In 1979, when Star-Kist's predecessors filed, the applicable regulation required that the affidavit be supported by evidence indicating the mark was still in use. 37 C.F.R. § 2.162(e) (1979). Star-Kist's predecessors submitted a label for 7½-ounce cans of sardines representing the mark as currently used. PJR contends the affidavit was fraudulent on the ground that the label was not actually in use in the United States or in exports from the United States at the time the affidavit was filed, but was only in use in trade between Japan and the Philippines. The district court found the label submitted was merely a smaller version of the label actually being used on 15-ounce cans sold in the United States, and was therefore an accurate representation of the mark then in use. This is a question of a factual nature, and we conclude the district court's findings are not clearly erroneous. We uphold the district court's determination that there was no fraud in the maintenance of the Bowl of Roses Design.

The judgment of the district court is AFFIRMED.