**TRIDENT CENTER, Plaintiff-Appellant,**

v.

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY,**
**Defendant-Appellee.**

Nos. 87-6085, 87-6267.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 8, 1988.

Decided May 24, 1988.

As Amended July 5, 1988.

---

Bradley S. Phillips, Munger, Tolles & Olson, Los Angeles, Cal., for plaintiff-appellant.

Robert W. Fischer, Jr., Dewey, Ballantine, Bushby, Palmer & Wood, Los Angeles, Cal., for defendant-appellee.

Before HUG, ALARCON and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge:

The parties to this transaction are, by any standard, highly sophisticated business people: Plaintiff is a partnership consisting of an insurance company and two of Los Angeles' largest and most prestigious law firms; defendant is another insurance company. Dealing at arm's length and from positions of roughly equal bargaining strength, they negotiated a commercial loan amounting to more than $56 million. The contract documents are lengthy and detailed; they squarely address the precise issue that is the subject of this dispute; to all who read English, they appear to resolve the issue fully and conclusively.

Plaintiff nevertheless argues here, as it did below, that it is entitled to introduce extrinsic evidence that the contract means something other than what it says. This case therefore presents the question whether parties in California can ever draft a contract that is proof to parol evidence. Somewhat surprisingly, the answer is no.

### Facts

The facts are rather simple. Sometime in 1983 Security First Life Insurance Company and the law firms of Mitchell, Silberberg & Knupp and Manatt, Phelps, Rothenberg & Tunney formed a limited partnership for the purpose of constructing an office building complex on Olympic Boulevard in West Los Angeles. The partnership, Trident Center, the plaintiff herein, sought and obtained financing for the project from defendant, Connecticut General Life Insurance Company. The loan documents provide for a loan of $56,500,000 at 12¼ percent interest for a term of 15 years, secured by a deed of trust on the project. The promissory note provides that "[m]aker shall not have the right to prepay the principal amount hereof in whole or in part" for the first 12 years. Note at 6. In years 13–15, the loan may be prepaid, subject to a sliding prepayment fee. The note also provides that in case of a default during years 1–12, Connecticut General has the option of accelerating the note and adding a 10 percent prepayment fee.

Everything was copacetic for a few years until interest rates began to drop. The 12¼ percent rate that had seemed reasonable in 1983 compared unfavorably with 1987 market rates and Trident started looking for ways of refinancing the loan to take advantage of the lower rates. Connecticut General was unwilling to oblige, insisting that the loan could not be prepaid for the first 12 years of its life, that is, until January 1996.

Trident then brought suit in state court seeking a declaration that it was entitled to prepay the loan now, subject only to a 10 percent prepayment fee. Connecticut General promptly removed to federal court and brought a motion to dismiss, claiming that the loan documents clearly and unambiguously precluded prepayment during the first 12 years. The district court agreed and dismissed Trident's complaint. The court also *"sua sponte,* sanction[ed] the plaintiff for the filing of a frivolous lawsuit."* Order of Dismissal, No. CV 87–2712 JMI (Kx), at 3 (C.D. Cal. June 8, 1987).

Trident appeals both aspects of the district court's ruling.

### *Discussion*

### I

Trident makes two arguments as to why the district court's ruling is wrong. First, it contends that the language of the contract is ambiguous and proffers a construction that it believes supports its position. Second, Trident argues that, under California law, even seemingly unambiguous contracts are subject to modification by parol or extrinsic evidence. Trident faults the district court for denying it the opportunity to present evidence that the contract language did not accurately reflect the parties' intentions.

### A. The Contract

As noted earlier, the promissory note provides that Trident "shall not have the right to prepay the principal amount hereof in whole or in part before January 1996." Note at 6. It is difficult to imagine language that more clearly or unambiguously expresses the idea that Trident may not unilaterally prepay the loan during its first 12 years. Trident, however, argues that there is an ambiguity because another clause of the note provides that "[i]n the event of a prepayment resulting from a default hereunder or the Deed of Trust prior to January 10, 1996 the prepayment fee will be ten percent (10%)." Note at 6–7. Trident interprets this clause as giving it the option of prepaying the loan if only it is willing to incur the prepayment fee.

We reject Trident's argument out of hand. In the first place, its proffered interpretation would result in a contradiction between two clauses of the contract; the default clause would swallow up the clause prohibiting Trident from prepaying during the first 12 years of the contract. The normal rule of construction, of course, is that courts must interpret contracts, if possible, so as to avoid internal conflict. *See Brobeck, Phleger & Harrison v. Telex Corp.,* 602 F.2d 866, 872 (9th Cir.), *cert. denied,* 444 U.S. 981, 100 S.Ct. 483, 62

L.Ed.2d 407 (1979) (California law); Cal. Civ.Proc.Code § 1858 (West 1983); 4 S. Williston, *A Treatise on the Law of Contracts* § 618, at 714–15 (3d ed. 1961); *id.* § 624, at 825.

In any event, the clause on which Trident relies is not on its face reasonably susceptible to Trident's proffered interpretation. Whether to accelerate repayment of the loan in the event of default is entirely Connecticut General's decision. The contract makes this clear at several points. *See* Note at 4 ("in each such event [of default], the entire principal indebtedness, or so much thereof as may remain unpaid at the time, shall, *at the option of Holder,* become due and payable immediately" (emphasis added)); *id.* at 7 ("[i]n the event Holder exercises its *option to accelerate* the maturity hereof ..." (emphasis added)); Deed of Trust ¶ 2.01, at 25 ("in each such event [of default], Beneficiary *may* declare all sums secured hereby immediately due and payable ..." (emphasis added)). Even if Connecticut General decides to declare a default and accelerate, it "may rescind any notice of breach or default." *Id.* ¶ 2.02, at 26. Finally, Connecticut General has the option of doing nothing at all: "Beneficiary reserves the right at its sole option to waive noncompliance by Trustor with any of the conditions or covenants to be performed by Trustor hereunder." *Id.* ¶ 3.02, at 29.

Once again, it is difficult to imagine language that could more clearly assign to Connecticut General the exclusive right to decide whether to declare a default, whether and when to accelerate, and whether, having chosen to take advantage of any of its remedies, to rescind the process before its completion.

Trident nevertheless argues that it is entitled to precipitate a default and insist on acceleration by tendering the balance due on the note plus the 10 percent prepayment fee.[1] The contract language, cited above, leaves no room for this construction. It is true, of course, that Trident is free to stop making payments, which may then cause Connecticut General to declare a default and accelerate. But that is not to say that Connecticut General would be required to so respond.[2] The contract quite clearly gives Connecticut General other options: It may choose to waive the default, or to take advantage of some other remedy such as the right to collect "all the income, rents, royalties, revenue, issues, profits, and proceeds of the Property." Deed of Trust ¶ 1.18, at 22.[3] By interpreting the contract

---

**1.** Trident's position is that the prepayment fee must either be a fee imposed as part of an "alternative method of performance" or "a liquidated damages provision specifying the amount of damages payable by Trident in the event that it defaults by prepaying the ... loan." Appellant's Reply Brief at 12–13. Trident contends that if the prepayment fee is instead read as a provision for liquidated damages triggered by any default whatsoever, it would be invalid as a penalty because it would not be a reasonable estimate of the likely injury to Connecticut General resulting from most types of default: "[I]f, for example, Trident were to default on the payment of a single installment, a fee of 10% of the outstanding balance of the loan would not qualify as a valid liquidated damages payment." *Id.* at 8.

California law is unsettled on this point and it may be that Connecticut General could not enforce the 10 percent fee in the event of certain defaults by Trident. *See generally* 1 H. Miller & M. Starr, *Current Law of California Real Estate* § 3:71 n. 12 (Supp.1987). But the contract assigns to Connecticut General alone the right to decide whether and under what circumstances to seek the prepayment fee. Connecticut General may well attempt to enforce the fee only in circumstances where it is valid. What the contract clearly does not provide is what Trident suggests. If the parties had wanted to give Trident the option of prepaying with a 10 percent fee, they certainly could have done so expressly.

**2.** *See* 1 H. Miller & M. Starr, *supra* note 1, § 3:62, at 428 ("[w]hen there is a default, acceleration does not occur automatically. It is merely a contractual *option* given to beneficiary for his benefit, and acceleration only occurs when the beneficiary *affirmatively* elects to declare the balance of the principal and interest due" (emphasis original)); *id.* § 3:69, at 449.

**3.** Trident contends that acceleration must follow a default because, under California's one-form-of-action rule, Cal.Civ.Proc.Code § 726 (West Supp.1988), Connecticut General has but one remedy in the event of default, namely, to accelerate the loan and foreclose. Even if Trident's premise were accurate, its conclusion would not follow. Connecticut General need not seek any remedy at all for an event of default; it could simply wait and see. Connecticut General would thereby retain the valuable

as Trident suggests, we would ignore those provisions giving Connecticut General, not Trident, the exclusive right to decide how, when and whether the contract will be terminated upon default during the first 12 years.

In effect, Trident is attempting to obtain judicial sterilization of its intended default. But defaults are messy things; they are supposed to be. Once the maker of a note secured by a deed of trust defaults, its credit rating may deteriorate; attempts at favorable refinancing may be thwarted by the need to meet the trustee's sale schedule; its cash flow may be impaired if the beneficiary takes advantage of the assignment of rents remedy; default provisions in its loan agreements with other lenders may be triggered. Fear of these repercussions is strong medicine that keeps debtors from shirking their obligations when interest rates go down and they become disenchanted with their loans.[4] That Trident is willing to suffer the cost and delay of a lawsuit, rather than simply defaulting, shows far better than anything we might say that these provisions are having their intended effect. We decline Trident's invitation to truncate the lender's remedies and deprive Connecticut General of its bargained-for protection.

> right of choosing *when* to declare a default: It could, for example, choose to wait until interest rates rise and Trident's refinancing prospects are no longer attractive.
>
> In any event, Trident's premise is wrong. Section 726 does not prevent Connecticut General from exercising certain of its non-foreclosure remedies under the deed of trust. "By its own terms section 726 applies only where the creditor-beneficiary has *brought an action* against the debtor-trustor to recover a debt or to enforce some right secured by a deed of trust. It does not apply in other situations." *Passanisi v. Merit McBride Realtors, Inc.*, 236 Cal.Rptr. 59, 65, 190 Cal.App.3d 1496 (1987) (citation omitted) (emphasis added). Thus, for example, "a private sale under the power contained in the trust deed is not a *judicial* foreclosure within section 726." *Walker v. Community Bank*, 10 Cal.3d 729, 736, 518 P.2d 329, 111 Cal.Rptr. 897 (1974) (emphasis original). Similarly, Connecticut General could enforce the assignment of rents provision in the deed of trust by demanding that all of Trident's tenants make rental payments to Connecticut General. *See Johns v. Moore*, 168 Cal.App.2d 709, 712, 336 P.2d 579

### B. Extrinsic Evidence

Trident argues in the alternative that, even if the language of the contract appears to be unambiguous, the deal the parties actually struck is in fact quite different. It wishes to offer extrinsic evidence that the parties had agreed Trident could prepay at any time within the first 12 years by tendering the full amount plus a 10 percent prepayment fee. As discussed above, this is an interpretation to which the contract, as written, is not reasonably susceptible. Under traditional contract principles, extrinsic evidence is inadmissible to interpret, vary or add to the terms of an unambiguous integrated written instrument. *See* 4 S. Williston, *supra* p. 5, § 631, at 948–49; 2 B. Witkin, *California Evidence* § 981, at 926 (3d ed. 1986).

Trident points out, however, that California does not follow the traditional rule. Two decades ago the California Supreme Court in *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968), turned its back on the notion that a contract can ever have a plain meaning discernible by a court without resort to extrinsic evidence. The court reasoned that contractual obligations flow not from the words of the contract, but from the

(1959); 1 H. Miller & M. Starr, *supra* note 1, §§ 3:35 at 376–77, 3:69 at 449. This would not implicate section 726 because it would not be an action to enforce any right under the deed of trust. Since the deed of trust contains an absolute assignment of rents—"Trustor hereby absolutely and unconditionally assigns and transfers to Beneficiary all the income, rents … and proceeds of the Property …," Deed of Trust at 22, ¶ 1.18—Connecticut General has a perfected right to require that tenants pay it directly once it has given them notice of a default by Trident. *See* 1 H. Miller & M. Starr, § 3:35, at 377; *In re Charles D. Stapp of Nevada, Inc.*, 641 F.2d 737, 739 (9th Cir.1981); *Great West Life Assurance Co. v. Rothman*, 490 F.2d 1141, 1143–45 (9th Cir.1974).

4. This provides a symmetry with the situation where interest rates go up and it is the lender who is stuck with a loan it would prefer to turn over at market rates. In an economy where interest rates fluctuate, it is all but certain that one side or the other will be dissatisfied with a long-term loan at some time. Mutuality calls for enforcing the contract as written no matter whose ox is being gored.

intention of the parties. "Accordingly," the court stated, "the exclusion of relevant, extrinsic, evidence to explain the meaning of a written instrument could be justified only if it were feasible to determine the meaning the parties gave to the words from the instrument alone." 69 Cal.2d at 38, 442 P.2d 641, 69 Cal.Rptr. 561. This, the California Supreme Court concluded, is impossible: "If words had absolute and constant referents, it might be possible to discover contractual intention in the words themselves and in the manner in which they were arranged. Words, however, do not have absolute and constant referents." *Id.* In the same vein, the court noted that "[t]he exclusion of testimony that might contradict the linguistic background of the judge reflects a judicial belief in the possibility of perfect verbal expression. This belief is a remnant of a primitive faith in the inherent potency and inherent meaning of words." *Id.* at 37, 442 P.2d 641, 69 Cal.Rptr. 561 (citation and footnotes omitted).[5]

Under *Pacific Gas*, it matters not how clearly a contract is written, nor how completely it is integrated, nor how carefully it is negotiated, nor how squarely it addresses the issue before the court: the contract cannot be rendered impervious to attack by parol evidence. If one side is willing to claim that the parties intended one thing but the agreement provides for another, the court must consider extrinsic evidence of possible ambiguity. If that evidence raises the specter of ambiguity where there was none before, the contract language is displaced and the intention of the parties must be divined from self-serving testimony offered by partisan witnesses whose recollection is hazy from passage of time and colored by their conflicting interests. *See Delta Dynamics, Inc. v. Arioto*, 69 Cal.2d 525, 532, 446 P.2d 785, 72 Cal.Rptr. 785 (1968) (Mosk, J., dissenting). We question whether this approach is more likely to divulge the original intention of the parties than reliance on the seemingly clear words

they agreed upon at the time. *See generally Morta v. Korea Ins. Co.*, 840 F.2d 1452, 1460 (9th Cir.1988).

■ *Pacific Gas* casts a long shadow of uncertainty over all transactions negotiated and executed under the law of California. As this case illustrates, even when the transaction is very sizeable, even if it involves only sophisticated parties, even if it was negotiated with the aid of counsel, even if it results in contract language that is devoid of ambiguity, costly and protracted litigation cannot be avoided if one party has a strong enough motive for challenging the contract. While this rule creates much business for lawyers and an occasional windfall to some clients, it leads only to frustration and delay for most litigants and clogs already overburdened courts.

It also chips away at the foundation of our legal system. By giving credence to the idea that words are inadequate to express concepts, *Pacific Gas* undermines the basic principle that language provides a meaningful constraint on public and private conduct. If we are unwilling to say that parties, dealing face to face, can come up with language that binds them, how can we send anyone to jail for violating statutes consisting of mere words lacking "absolute and constant referents"? How can courts ever enforce decrees, not written in language understandable to all, but encoded in a dialect reflecting only the "linguistic background of the judge"? Can lower courts ever be faulted for failing to carry out the mandate of higher courts when "perfect verbal expression" is impossible? Are all attempts to develop the law in a reasoned and principled fashion doomed to failure as "remnant[s] of a primitive faith in the inherent potency and inherent meaning of words"?

Be that as it may. While we have our doubts about the wisdom of *Pacific Gas*, we have no difficulty understanding its meaning, even without extrinsic evidence to guide us. As we read the rule in Califor-

---

5. In an unusual footnote, the court compared the belief in the immutable meaning of words with " '[t]he elaborate system of taboo and verbal prohibitions in primitive groups ... [such as] the Swedish peasant custom of curing sick cattle smitten by witchcraft, by making them swallow a page torn out of the psalter and put in dough....' " *Id.* n. 2 (quoting Ullman, *The Principles of Semantics* 43 (1963)).

nia, we must reverse and remand to the district court in order to give plaintiff an opportunity to present extrinsic evidence as to the intention of the parties in drafting the contract.[6] It may not be a wise rule we are applying, but it is a rule that binds us. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938).[7]

## II

■ In imposing sanctions on plaintiff, the district court stated:

> Pursuant to Fed.R.Civ.P. 11, the Court, *sua sponte*, sanctions the plaintiff for the filing of a frivolous lawsuit. The Court concludes that the language in the note and deed of trust is plain and clear. No reasonable person, much less firms of able attorneys, could possibly misunderstand this crystal-clear language. Therefore, this action was brought in bad faith.

Order of Dismissal at 3. Having reversed the district court on its substantive ruling, we must, of course, also reverse it as to the award of sanctions.[8] While we share the district judge's impatience with this litigation, we would suggest that his irritation may have been misdirected. It is difficult to blame plaintiff and its lawyers for bringing this lawsuit. With this much money at stake, they would have been foolish not to pursue all remedies available to them under the applicable law. At fault, it seems to us, are not the parties and their lawyers but the legal system that encourages this kind of lawsuit. By holding that language has no objective meaning, and that con-

tracts mean only what courts ultimately say they do, *Pacific Gas* invites precisely this type of lawsuit.[9] With the benefit of 20 years of hindsight, the California Supreme Court may wish to revisit the issue. If it does so, we commend to it the facts of this case as a paradigmatic example of why the traditional rule, based on centuries of experience, reflects the far wiser approach.

### Conclusion

The judgment of the district court is REVERSED. The case is REMANDED for reinstatement of the complaint and further proceedings in accordance with this opinion. The parties shall bear their own costs on appeal.

---

6. Nothing we say should be construed as foreclosing Connecticut General from moving for summary judgment after completion of discovery; given the unambiguous language of the contract itself, such a motion would succeed unless Trident were to come forward with extrinsic evidence sufficient to render the contract reasonably susceptible to Trident's alternate interpretation, thereby creating a genuine issue of fact resolvable only at trial.

7. Trident also claims, in the alternative, that it is entitled to rescind the loan agreement because it entered into the contract based on a unilateral mistake of law of which Connecticut General was aware but failed to correct. Implausible though this allegation may be, it nevertheless states a claim for unilateral mistake under California law. Cal.Civ.Code §§ 1578, 1689 (West

1982, 1985). This cause of action therefore must also be reinstated by the district court for later resolution on summary judgment or at trial.

8. The district court apparently awarded attorney's fees under both Rule 11 and the terms of the promissory note. Trident contends that the note's attorney's fees provision is inapplicable to this case. In light of our resolution of the merits, we express no view on this issue.

9. This is not to say, of course, that all lawsuits seeking to challenge the interpretation of facially unambiguous contracts are necessarily immune from imposition of sanctions. Even under *Pacific Gas*, a party urging an interpretation lacking any objectively reasonable basis in fact might well be subject to sanctions for bringing a frivolous lawsuit.