**ZENGER–MILLER, INC., a California corporation, Plaintiff,**

v.

**TRAINING TEAM, GMBH, a foreign corporation, and Astrid Karakash, an individual, Defendants.**

**No. 90–20392 RFP.**

United States District Court, N.D. California.

Feb. 13, 1991.

Edward Smithers and Donald E. Sloan, Gibson, Dunn & Crutcher, San José, Cal., for plaintiff.

Patricia M. Lucas and Walter W. O'Haire, Brown & Bain, Palo Alto, Cal., for defendants.

## ORDER

PECKHAM, District Judge.

### I. INTRODUCTION

Defendants bring before the court a motion to dismiss plaintiff's action for breach

of contract, copyright violations, Lanham Act violations and fraud, or alternatively stay the action pending arbitration. First, defendants maintain that the language of their two contracts with plaintiff unambiguously provides for arbitration of all claims. They contend that, at best, the language is ambiguous as to the kinds of disputes that should be arbitrated and those that should be litigated. Therefore, the court should consider defendants' extrinsic evidence in ascertaining the intentions of the parties. Even if the language clearly provides for arbitration of fee disputes only, defendants contend that the California parol evidence rule compels the court to preliminarily consider evidence outside the contract. Defendants' extrinsic evidence purportedly confirms the parties' intention that all claims be arbitrated. Therefore, all claims brought before this court should be dismissed or stayed pending arbitration.

Second, defendants maintain that the court lacks personal jurisdiction over them because (1) defendants contractually consented to jurisdiction only in litigation following an arbitration award, and (2) defendants are Germans whose only contact with California was entering into contracts with plaintiff.

Third, defendants contend that the court lacks subject matter jurisdiction because U.S. copyright laws and the Lanham Act do not apply to alleged acts of infringement which occurred wholly outside the United States.

## II. FACTS

Plaintiff Zenger–Miller, Inc. ("ZMI") is a California corporation that creates, develops and distributes management and employee training programs to major organizations worldwide. ZMI has conducted business either directly or through representatives in several European countries. In late 1987, Steve Mann, then Senior Vice President of ZMI, and Defendant Astrid Karakash ("Karakash") began discussing the possibility of Karakash's acting as a ZMI representative and distributor in Germany. In the midst of these discussions, Karakash organized defendant Training Team GmbH ("Training Team") to adapt and distribute ZMI products. All discussions between Steve Mann and Karakash took place in Germany except for one session which took place in Paris. Karakash is a German national who resides in Frankfurt/Main and who is not an American citizen.

Early in 1988, ZMI submitted a draft agreement ("Draft") to Training Team setting forth the terms of the distributor relationship. The Draft provided in part that the contract would be governed by California law, that disputes regarding interpretation, breach or enforcement would be litigated in California, and that Training Team would consent to the personal jurisdiction of California (the "choice of forum/choice of law clause"). After reviewing the Draft, Karakash's counsel, Mr. Ulrich Koch ("Koch"), disapproved of the choice of forum/choice of law clause. Koch maintains that he could not possibly have advised Karakash to sign such a one-sided clause. Karakash contends that, because of Koch's warning, she proposed to ZMI that disputes be resolved in German courts under German law. ZMI did not accept this proposal.

According to ZMI, Koch was concerned that protection of ZMI's intellectual property rights under U.S. law would violate German law. However, ZMI's United States and German counsel reviewed the Draft and found no such violation. ZMI contends that it conveyed this information to Karakash. In any event, the choice of forum/choice of law clause was incorporated in the final drafts exactly as it was found in the original Draft.[1]

ZMI and Training Team then agreed to add an arbitration clause to their two contracts. It seems that the parties intended

---

1. ZMI and Training Team entered into two final contracts: the "Development Agreement," in which Training Team agreed to translate certain ZMI products into the German language, and the "Representative Agreement," in which ZMI gave Training Team the exclusive right to distribute certain ZMI products in West Germany. Both agreements contain the same choice of forum/choice of law clause and the same arbitration provision.

to at least partially resolve the conflict over forum/law selection with the arbitration clause. The facts regarding the parties' preliminary negotiations as to the site of arbitration are in dispute. Karakash maintains that ZMI initially proposed San Francisco as the site, but that Training Team refused either to litigate or arbitrate in California. In any event, Paris was finally selected as the site of arbitration. Karakash also contends that ZMI and Training Team finally agreed that all disputes would be arbitrated. However, the arbitration clause in both final drafts provided that controversies or claims arising out of, or related to "amounts due and owing" would be arbitrated.

## III. DISCUSSION

### 1. *Scope of the arbitration and forum selection clauses*

#### a. *The language of the contract*

■ Defendants first contend that the language of the arbitration clause unambiguously provides for arbitration of all claims. This is simply a misreading of the clause. The arbitration clause states that "[a]ny controversy or claim arising out of, or related to, *amounts due and owing* under this Agreement shall be settled by arbitration ..." (emphasis added). Plaintiff does not overreach in stating that "claims arising out of, or related to, amounts due and owing" mean "fee disputes."

Defendants also incorrectly quote *Mediterranean v. Ssangyong*, 708 F.2d 1458 (9th Cir.1983) to support their interpretation of the clause. They quote *Mediterranean* as having stated that the language "arising out of or relating to" denotes a broad arbitration clause. *Mediterranean* actually stated that the phrase "arising out of or relating to *this agreement*" has been labelled a broad arbitration clause. *Mediterranean* at 1464 (citations omitted). Evidently, "arising out of or relating to *this agreement*" is more expansive than "arising out of relating to *amounts due and owing* under this agreement."

*Mediterranean* even holds that the omission of the phrase "relating to" would reduce the scope of an arbitration agreement:

"The omission [of the phrase "relating to"] should be significant in this circuit as well. The standard clause suggested in the U.S.–Korean Commercial Arbitration Agreement contains the phrase, 'out of or in relation to or in connection with this contract, or for the breach thereof.' We have no difficulty finding that 'arising hereunder' is intended to cover a much narrower scope of disputes ..." *Id.* at 1464.

Applying the same analysis to the language herein, the addition of the phrase "amounts due and owing" significantly limits the scope of the arbitration clause.

■ Defendants maintain that, at best, the language of the arbitration clause is ambiguous as to its scope. However, any ambiguity in the language itself is resolved by the fact that the parties incorporated a separate choice of forum/choice of law clause, which designates California as the site of litigation of the substantive issues:

"This Agreement shall be governed by and construed in accordance with the laws of the State of California, U.S.A. (except that body of laws controlling conflicts of law).... Representative [defendants] agrees that any litigation regarding the interpretation, breach or enforcement of this Agreement shall be filed in and heard by the state or federal courts with jurisdiction to hear such disputes in Santa Clara County, California and Representative hereby submits to the personal jurisdiction of such courts."

The parties defined the outer boundaries of the arbitration clause by expressly providing for the litigation of interpretation, breach and enforcement here. Moreover, even if plaintiff singlehandedly drafted this forum selection clause, defendants undoubtedly were aware of it, since they objected to its language on several occasions. Notwithstanding their objections, defendants agreed to the language by executing the agreement.

■ One area of slight ambiguity remains. Since plaintiff is suing in part for money damages, the resolution of any substantive issue (e.g., interpretation, breach) will necessarily affect the damages award or, said another way, will "relate to amounts due and owing." Since the arbitration clause covers all controversies "relating to amounts due and owing," all substantive issues that would affect plaintiff's damages would be arbitrable under this reading of the clause. However, such a reading is implausible in light of the drafter's effort to make an express and definite distinction between arbitrable and non-arbitrable claims (e.g., writing separate clauses for litigation and arbitration, drawing the line between substantive issues and fee disputes, avoiding listing the clauses back-to-back in the contract). Therefore, this court finds that the clauses, read together, unambiguously determine the scope of arbitration.

b. *Consideration of extrinsic evidence*

■ Defendants next contend that, even if the language of the contracts unambiguously limits arbitration to fee disputes, the California parol evidence rule allows defendants to present evidence that the contracts do not accurately reflect the parties' intentions. The Ninth Circuit has held that federal law governs the scope and interpretation of arbitration clauses (*Mediterranean* at 1463) and forum selection clauses (*Manetti–Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 513 (9th Cir. 1988)). Under the federal parol evidence standard, extrinsic evidence is inadmissible to interpret or vary the terms of an unambiguous, fully integrated written contract. *Manetti–Farrow* at 514; *Trident Center v. Connecticut General Life Ins.*, 847 F.2d 564, 568 (9th Cir.1988). However, defendants' correctly point to the parties' choice of California law in their contracts. In *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968) the California court rejected the notion that ambiguity was in any way relevant to the admissibility of extrinsic evidence. Instead, the court held that, despite a lack of ambiguity, the words of a contract alone can never impart its meaning:

"If words had absolute and constant referents, it might be possible to discover contractual intention in the words themselves and in the manner in which they were arranged. Words however, do not have absolute and constant referents.... Accordingly, the meaning of a writing ... 'can only be found by interpretation in light of all the circumstances that reveal the sense in which the writer used the words.'" Id. at 38–39, 442 P.2d 641, 69 Cal.Rptr. 561. (Citations omitted.)

■ Although extrinsic evidence cannot be used to add to, detract from, or vary the terms of a written contract, the terms must first be ascertained before it can be determined whether the extrinsic evidence is being used impermissibly. At least a preliminary consideration of all evidence offered to prove the parties' intention—including testimony as to the circumstances surrounding the contract—is necessary to determine those terms. If the court decides that the language of the contract is fairly susceptible of two interpretations, then extrinsic evidence relevant to prove either interpretation will be allowed. Id. at 39–40, 442 P.2d 641, 69 Cal.Rptr. 561.

The Ninth Circuit confirmed, albeit reluctantly, that the *Pacific Gas* decision eliminated the power of parties in California to draft a contract immune to parol evidence:

"*Pacific Gas* casts a long shadow of uncertainty over all transactions negotiated and executed under the law of California.... [E]ven where the transaction is very sizeable, even if it involves only sophisticated parties, even if it was negotiated with the aid of counsel, even if it results in contract language that is devoid of ambiguity, costly and protracted litigation cannot be avoided if one party has a strong enough motive for challenging the contract." *Trident Center*, 847 F.2d at 569.

Notwithstanding such criticism, this court is bound by *Pacific Gas* because of the parties' choice of law clause. Therefore, as defendants maintain, we must pre-

liminarily consider their extrinsic evidence irrespective of the contracts' clarity.

■ A consideration of defendants' extrinsic evidence does not render the contract ambiguous. That evidence is as follows: Defendant's German counsel asserts in his declaration that, during contract negotiations, defendants explicitly notified plaintiff of their desire to arbitrate *all* disputes. Defendants argue in their brief that the focus of the negotiations was always on how to resolve *all* disputes, and not just particular kinds of disputes. Defendants also assert that plaintiff never communicated the position it now asserts: that the arbitration clause would be very narrow and that defendants would still be subject to litigation in California on matters never arbitrated. They contend that, if there had been any discussions or agreements regarding a narrow arbitration clause, plaintiff surely would have presented declarations to that effect.

This extrinsic evidence is inconsistent with the undisputed fact that, though defendants were fully aware of the forum selection clause, they left it in the final drafts exactly as it appeared in plaintiff's original drafts. Defendants are sophisticated business parties who had the power to bargain for the exclusion of terms that did not accommodate their needs. Indeed, the evidence shows that they did actually bargain; in their own brief, defendants assert that they objected to the forum selection clause several times, and negotiated extensively with plaintiff regarding forum selection and the site of arbitration. However, defendants not only failed to remove the forum selection clause from the contracts, but also failed even to modify its terms. Considering that the contracts were negotiated extensively, at arm's length, and with the aid of independent counsel, it is reasonable to hold the defendants responsible for their failure to omit the clause, and to draft a more expansive arbitration clause. Therefore, this court finds that defendants' extrinsic evidence is not sufficient to render the contract susceptible of two interpretations.

Accordingly, defendants' motion to dismiss on the ground that the claims should be arbitrated is denied. This court also denies defendants' motion to stay the action pending arbitration.

2. *Personal jurisdiction*

■ Defendants' next contention is that the court lacks personal jurisdiction over them. However, both contracts contained the following phrase in the choice of forum/choice of law clause: "Representative [defendants] hereby submits to the personal jurisdiction of [the Santa Clara County state or federal courts]." "If a defendant consents to personal jurisdiction in a particular forum, then the court need not inquire further." *Ruggieri v. General Well Service, Inc.,* 535 F.Supp. 525, 528–29 (D.C.Col.1982). This is especially true when the consent was obtained in contracts negotiated at arm's length, as previously discussed.

■ Defendants argue that, since they understood the contracts to provide for the arbitration of all claims, they intended to consent to jurisdiction only in litigation following an arbitration award. The arbitration clause does provide that "any legal action following the arbitration award shall be resolved according to [the choice of forum/choice of law clause]." However, this does not mean that *all* legal action will follow an arbitration award. Neither does this clause conflict with the choice of forum/choice of law clause. Read together, the clauses state that issues of interpretation, breach, or enforcement, *and* any legal action following arbitration, will be litigated in Santa Clara county state or federal courts, with defendants consenting to the jurisdiction of those courts.

In the early negotiation stages between plaintiff and defendants, defendants understood the "consent to jurisdiction" clause perfectly and objected to it several times. It is quite unreasonable for defendants to believe that the arbitration clause limited the scope of their consent to jurisdiction when *none* of the language in the "consent to jurisdiction" clause was changed during negotiations.

■ Defendants also contend that their consent to jurisdiction is invalid because they did not have substantial or continuous contacts with the forum state. They point to the fact that the contracts were negotiated and executed in Germany and the fact that defendants performed all of their contractual duties in Germany. However, the court need not embark on a "minimum contacts" analysis where the defendants have consented to California jurisdiction.

■ The only issue for the court is whether the contracts are unfair or unreasonable. As stated in *Ruggieri*, "... contracting parties may expressly consent to litigate issues regarding the contract in a particular forum and this choice will normally be binding unless it is unfair or unreasonable." *Id.* at 528–29 (citations omitted). Defendants may face hardship in travelling to California for litigation. However, as stated before, defendants were fully aware of the consent clause and were in a position to bargain for its exclusion during negotiations. Therefore, this court finds that the contracts are not unreasonable, and that defendants' consent to personal jurisdiction is valid and binding.

### 3. *Subject Matter Jurisdiction*

■ Defendants maintain that the district court lacks subject matter jurisdiction in the copyright and Lanham Act claims because U.S. copyright laws and the Lanham Act do not have extraterritorial application in this case. To this, plaintiff replies that defendants' contractual consent to the application of U.S. law established subject matter jurisdiction. Plaintiff is wrong for two reasons. First, defendants consented to the application of California, not federal, law. Second, subject matter jurisdiction, unlike personal jurisdiction, "cannot be consented to by the parties because it relates to the court's inherent power to hear and decide the case." *Ruggieri v. General Well Service*, 535 F.Supp. 525, 528 n. 2 (D.C.Col.1982). Hence, the court's subject matter jurisdiction does rest upon the extraterritorial reach of the Lanham Act and copyright laws in this case.

■ To support their contention that the Lanham Act has no extraterritorial effect here, defendants point to the recent Ninth Circuit decision, *Independent Union of Flight Attendants v. Pan Am*, 923 F.2d 678 (9th Cir.1991). The *Independent* court noted that there is a presumption against the extraterritorial effect of federal statutes, as set forth in *Foley Bros. v. Filardo*, 336 U.S. 281, 69 S.Ct. 575, 93 L.Ed. 680 (1949):

> "The canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States, is a valid approach whereby unexpressed congressional intent may be ascertained." *Foley* at 285, 69 S.Ct. at 577.

Although *Independent* sheds some light on the extraterritoriality of federal statutes in general, its particular focus was on the Railway Labor Act. The Ninth Circuit's discussion of the extraterritorial effect of the Lanham Act appeared in two other cases. *Star–Kist Foods v. P.J. Rhodes & Co.*, 769 F.2d 1393 (9th Cir.1985) and *Wells Fargo v. Wells Fargo Express Co.*, 556 F.2d 406 (9th Cir.1977). Therefore, *Independent* is somewhat inapposite here, and the latter two cases govern our discussion of the facts. An analysis of those cases reveals that this court indeed does not have subject matter jurisdiction in the Lanham Act claim.

In *Star–Kist*, defendant PJR, a California corporation, purchased canned fish in the United States and Japan and resold it in the Philippines pursuant to a distributor agreement with plaintiff Star–Kist. PJR violated the distributor agreement and Star–Kist's trademarks by selling the fish with its own labels. Star–Kist consequently brought an action under the Lanham Act. The court of appeals held that the district court properly limited the scope of relief to exclude evidence of PJR's wholly foreign trade (i.e., PJR's purchases from Japan and sales to the Philippines).

In its analysis, the court first noted the Ninth Circuit decision in *Wells Fargo*. The *Wells Fargo* court held that the "balancing

test" use to determine the extraterritorial reach of the Sherman Act in *Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n*, 549 F.2d 597 (9th Cir.1976) would apply with respect to the extraterritoriality of the Lanham Act. *Wells Fargo*, 556 F.2d at 427. The *Timberlane* test consisted of the following requirements: first, that the foreign activity have some effect on American commerce; second, that the effect be sufficiently great to present a cognizable injury to plaintiffs under the federal statute; and third, that the interests of and links to American foreign commerce be sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority. *Star-Kist*, 769 F.2d at 1395 (citations omitted).

*Timberlane*'s discussion of the third requirement noted seven relevant factors which the Ninth Circuit held should be balanced in each case. Those factors were:

> "... the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad." *Star-Kist* at 1395 (citations omitted).

Without any discussion, the *Star-Kist* court concluded that the first and second requirements had been satisfied—i.e., that PJR's foreign trade had had *some* effect on American foreign commerce, and that the effect had been sufficiently great to present a cognizable injury under the Lanham Act. Presumably, the same can be said in our case. Though all of Training Team's alleged infringing activities occurred in Germany, its activities most likely had *some* effect on American foreign commerce, and that effect was sufficiently great to provide ZMI with a colorable claim. Much more cannot be said about the first two requirements, since *Star-Kist* did not provide any guidelines for their analysis.

The court's analysis of the third requirement (or more precisely, its balancing of the seven factors) led to its decision against the Act's extraterritorial application. First, the court concluded that application of the Lanham Act to Philippine commerce could create a conflict with Philippine patent and trademark laws and with pending proceedings in that country. (Star-Kist had a trademark registration in the Philippines, and PJR had petitioned to cancel that registration in the Philippine Patent Office.) Second, the adjudication of the right to use the trademarks in Philippine commerce with nations other than the United States would require the testimony of Philippine nationals and the production and analysis of Philippine documents. Third, the effect on United States commerce from the alleged illegal use of the trademarks in trade between the Philippines and other foreign countries was relatively insignificant compared to the effect on Philippine commerce. The court did not discuss the remaining four factors, but stated that they did not mandate a contrary result.

Consideration of our facts in light of *Star-Kist* and the *Timberlane* factors warrants the same conclusion. First, concerning the location of the parties, defendant Training Team is a German corporation which is located only in Frankfurt and which conducts no business in the United States. On the other hand, plaintiff, a California corporation, has a German office and frequently conducts its business in Europe. Although Karakash made three trips to California relating to Training Team's contracts with plaintiff, all negotiations *leading to* the contract involved plaintiff's German office and occurred outside the United States. Therefore, adjudication of defendants' right to use their own labels necessarily would involve the production of German documents, the testimony of German nationals, and the testimony of employees at plaintiff's German office. Further, since

it is undisputed that all allged infringing activities occurred in Germany, German purchasers of plaintiff's products would substantially be affected by defendants' activities. Although plaintiff would also be substantially affected, it would primarily feel those effects in its European business rather than its American business. Therefore, the effect on United States commerce from the alleged infringing activities is relatively minimal compared to the effect on German commerce. In the same vein, conduct within the United States (e.g., plaintiff's obtaining a copyright from the United States Register of Copyrights) is relatively unimportant to the violations charged compared to defendants' alleged acts of infringement in Germany. Lastly, an injunction issued by a German court would be more effective than one issued by this court, since a German court would be able to exercise its supervisory power with respect to conduct within its geographical reach.

The remaining factors cannot be "balanced" without additional facts. For instance, since it is uncertain whether plaintiff has a German trademark registration, we cannot determine the degree of conflict with potential German proceedings. Likewise, it is unclear whether defendants had an explicit purpose to affect American commerce and, if so, whether this purpose was foreseeable. However, even if these factors were to strengthen the links to American commerce, a balancing with the factors previously mentioned would still weigh in favor of adjudication in Germany. This is especially true in light of the presumption against the extraterritoriality of federal statutes, and in light of the fact that defendants are foreign themselves. (*Star–Kist* ruled against the application of the Lanham Act to defendant's foreign activities even though defendant was a California corporation; see also *Dolby v. Robertson*, 654 F.Supp. 815, 819 (N.D.Cal. 1986), where the court held that it did not have jurisdiction under the Lanham Act to enjoin British defendant's activities in Britain.) Therefore, even though the Lanham Act can theoretically extend to a foreign defendant's activities outside the United States, it does not do so in this instance. Accordingly, this court dismisses the Lanham Act claim for lack of subject matter jurisdiction.

■ As with the Lanham Act, courts agree that United States copyright laws [17 U.S.C. § 101 *et seq.* (1976) ] *generally* do not have extraterritorial application. *Peter Starr v. Twin Continental Films*, 783 F.2d 1440, 1442 (9th Cir.1986); *Robert Stigwood Group v. O'Reilly*, 530 F.2d 1096 (2nd Cir.1976), *cert. denied*, 429 U.S. 848, 97 S.Ct. 135, 50 L.Ed.2d 121 (1976), superseded on different grounds by statute as stated in *Walt Disney Co. v. Powell*, 897 F.2d 565 (D.C.Cir.1990). However, courts have not established a "balancing test" to determine when there would be such application. Rather, the law is that an infringing act occurring outside the United States is not actionable in the district courts unless the act is part of, or a consequence of, an *act of infringement* occurring within the United States. *Peter Starr*, 783 F.2d at 1442–43; *Fantasy v. Fogerty*, 664 F.Supp. 1345, 1351 (N.D.Cal. 1987) ("[W]here some infringing acts do take place in the United States, a plaintiff may recover through a constructive trust the extraterritorial profits derived from those infringing acts."); *Update Art v. Modiin Publishing*, 843 F.2d 67, 73 (2nd Cir. 1988) ("There is an exception [to the rule against extraterritoriality]—when the type of infringement permits further reproduction abroad—such as the unauthorized manufacture of copyrighted material in the United States.")

■ The undisputed facts show that none of defendants' alleged infringing activities occurred in the United States. In its complaint and brief, plaintiff does not allege activity *of any kind* by defendants in the United States. Moreover, all negotiations leading to the contracts took place outside the U.S., and the contracts were signed in Frankfurt. A letter describing defendant Karakash's three trips to the U.S. does not depict any *infringing* activity on her part here. Absent a showing that an infringing act occurred in the U.S., plaintiff "cannot avoid application of the

general rule that the copyright laws do not have extraterritorial operation." *Ahbez v. Edwin H. Morris & Co.*, 548 F.Supp. 664, 667 (S.D.N.Y.1982) (citations omitted).

Cases which have asserted jurisdiction based on the application of copyright laws have uniformly found some act of infringement in the U.S. In *Peter Starr*, plaintiff owned the copyrights to certain American motion pictures. In a contract executed in the United States and without plaintiff's consent, defendant authorized a third party to exhibit the motion pictures outside the United States. Because the court found defendant's authorization of the third party to be an infringing act in itself, it held that defendant's act fell within the scope of United States copyright laws. The court did not discuss the application of U.S. copyright laws to the third party's foreign exhibitions. However, in *Fantasy*, the court refrained from determining the application of U.S. copyright laws to defendant's foreign profits until the jury could decide whether defendant's activity *within* the United States constituted an infringement. Id. at 1351–52. See also *Update Art*, 843 F.2d at 73; *Robert Stigwood*, 530 F.2d at 1100–1101; *Ahbez*, 548 F.Supp. at 667. The facts in our case barely involve defendants' *presence* in the United States, let alone any acts of infringement in this country.

For the reasons stated, this court finds against the application of United States copyright laws to defendants' activities, and dismisses that claim accordingly.

## IV. CONCLUSION

For the reasons stated, this court denies that part of defendants' motion which seeks dismissal on the ground that the parties contracted for arbitration of all claims. Since defendants' motion to stay the action pending arbitration is based on the same grounds, it is also denied. This court also denies that part of defendants' motion which seeks dismissal for lack of personal jurisdiction. However, this court grants defendants' motion to dismiss the Lanham Act and copyright claims for lack of subject matter jurisdiction.

IT IS SO ORDERED.