UNITED STATES of America, f/u/b/o KRUPP STEEL PRODUCTS, INC., d/b/a Diversified Steel Services, Plaintiff-Appellee,

v.

AETNA INSURANCE COMPANY, Defendant-Appellant.

No. 86–3647.

United States Court of Appeals, Eleventh Circuit.

Nov. 5, 1987.

---

John H. Rains, III, Annis, Mitchell, Cockey, Edwards & Roehn, P.A., Tampa, Fla., for defendant-appellant.

Robert M. Quinn, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Crystal Whitescarver, Tampa, Fla., for plaintiff-appellee.

Before JOHNSON and EDMONDSON, Circuit Judges, and HOFFMAN *, Senior District Judge.

JOHNSON, Circuit Judge:

Krupp Steel Products, Inc., d/b/a Diversified Steel Services, is a supplier of steel. Allied Steel Fabrications fabricates steel. As a subcontractor under contractor John D. Grubbs, Inc., for construction of the Forest Hills Post Office in Tampa, Florida, Allied ordered steel from Diversified. Only one payment of $10,058.39 has been made for Diversified's deliveries to Allied. Allied still owes Diversified $39,667.82. To cover the outstanding payments Diversified sued

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

Aetna Insurance Company, the surety for the project, under the Miller Act.

The District Court granted Diversified's motion for summary judgment and correspondingly awarded to Diversified the full sum of $39,667.82 as well as attorneys' fees of $5,524.00. Aetna contests both the summary judgment and the attorneys' fees award in this appeal.

We first consider whether the district court was correct in finding no remaining genuine and material issues of fact in this case. This review requires an understanding of Miller Act claims generally and an understanding of the practice of the supplier trade specifically. We then consider the issue of attorneys' fees.

■ The Miller Act, 40 U.S.C.A. § 270a–270d, "requires a Government contractor to post a surety bond 'for the protection of all persons supplying labor and material in the prosecution of the work provided for' in the contract." *F.D. Rich Co. v. Industrial Lumber Co.*, 417 U.S. 116, 118, 94 S.Ct. 2157, 2159, 40 L.Ed.2d 703 (1974). The Act is "highly remedial in nature," and its terms should be liberally construed. *J.W. Bateson Co. v. U.S. ex rel. Board of Trustees*, 434 U.S. 586, 594, 98 S.Ct. 873, 877, 55 L.Ed.2d 50 (1978); *United States ex rel. Carlson v. Continental Casualty Co.*, 414 F.2d 431 (5th Cir.1969). Four elements must be proven by a plaintiff to collect under Section 270b: 1) that materials were supplied for work in the particular contract at issue; 2) that the supplier is unpaid; 3) that the supplier had a good faith belief that the materials were for the specified work; and 4) that jurisdictional requisites are met. *United States v. Avanti Constructors, Inc.*, 750 F.2d 759 (9th Cir. 1984).[1]

Appellant Aetna pursues several defenses on this appeal: 1) that the steel delivered by Diversified was not used for the Forest Hills project; and 2) that Aetna is entitled to a set-off for improper lien waivers, or that Diversified is estopped from claiming payment because of reliance on improper lien waivers. In the context of

arguing these points, Aetna maintains that there are unresolved issues of fact that should have precluded summary judgment. We address these defenses in turn.

■ As to the destination of the materials supplied, Aetna's arguments are unsupported by fact and law. First, Aetna fails to substantiate that the materials were not actually used for the Forest Hills project. There is simply no evidence that the materials were used elsewhere or not at all. Aetna is incorrect in claiming that the burden is on Diversified to provide affirmative proof that the materials were used to build the Forest Hills Post Office. As long as there is good faith, "under the law of this Circuit, delivery to the job site or actual use in the prosecution of the work is immaterial to a right of recovery." *United States ex rel. Lanahan Lumber v. Spearin, Preston & Burrows, Inc.*, 496 F.Supp. 816 (M.D.Fla.1980) (citing *Continental Casualty*).

■ There are no facts to put Diversified's good faith at issue, and the record suffices to indicate good faith. *Continental Casualty*, 414 F.2d at 433–34. Each invoice and each delivery ticket for shipments of steel designated the Forest Hills project as the reason for the purchase. Diversified's credit manager testified that the steel was intended for the Forest Hills project. Even Aetna's answer to the complaint admits the fact. The district court was correct to accept the pretrial record as definitive on this point. With no remaining factual dispute regarding Diversified's good faith belief, Diversified is entitled to the presumption that the steel was used for Forest Hills as contracted.

■ As to the estoppel defense, Aetna has made a showing of genuine and material unresolved issues of fact. The unresolved issues of fact turn on the issuance by Diversified to Allied of two partial lien waivers during one pay period. Aetna alleges that Grubbs made two payments to Allied to cover the two lien waivers and argues that, because Diversified issued the

1. The second and fourth elements are met in this case and are not in dispute.

two lien waivers, Grubbs justifiably relied on them.

To understand the issues in this case, one must understand the practice of financing transactions for supplied materials. In the normal course of events, Grubbs pays Allied who pays Diversified. However, Grubbs only pays Allied for work performed or materials supplied. Diversified holds security for materials it supplies on a "job basis," the credit arrangement for the Forest Hills Post Office, based on lien rights against the payment bond executed by the surety of the project. Diversified relinquishes its lien bit by bit as it receives payment from Allied. This exchange is formally recorded as a partial lien waiver, issued by Diversified, and subsequently presented by Allied to Grubbs as proof of delivery by Diversified and payment by Allied. Grubbs correspondingly reimburses Allied for the payment to Diversified.

At issue in this case are one partial lien waiver signed October 26, 1984, and a second partial lien waiver signed November 15, 1984. The first waiver of lien was issued for a nominal $10.00. The second waiver of lien explicitly covered the one payment of $10,058.34 received from Allied. The confusion arises in that the two lien waivers cover the same pay period and represent only one actual payment by Allied to Diversified. Both have "effective dates" of August 31, 1984.

Aetna's objection is that Diversified misled Grubbs in its payments to Allied. Aetna alleges that Grubbs has already made two progress payments to Allied in accordance with the two partial lien waivers. In figures, the difference is whether Diversified is entitled to $39,667.82 for supplies delivered after August 31, or to $1,156.00 for supplies delivered after November 15. Aetna claims that Grubbs interpreted and detrimentally relied on the execution date on the second partial lien waiver of November 15 as the effective date, meaning the date through which payments would have been received from Allied.

This dispute puts into question the relative meanings and importance of an effective date versus an execution date. Both partial lien waivers in question were filled out first with the project, Forest Hills, and then listed immediately below that was the date, 8/31/84, followed below that by the receiver, Allied. The date-of-signing slot was respectively filled in as October 26 and November 15, 1984 over the signature of Diversified's credit manager. Diversified and Allied disagree as to the relevance of the August 31, 1984, date filled in on both forms.[2] Diversified states that the effective date of August 31 means that the partial lien waiver was intended to represent payment for all supplies delivered through August, not through the dates on which the releases were signed. On the other hand, Aetna cites the testimony of Grubbs' vice president, who maintained that "it is customary" for the effective date to be the date of execution.

Part of the difficulty of this case is the informal notation form used for filling out these partial lien waivers. The form cannot be correctly interpreted without a clear sense of 1) the understandings between Allied and Diversified, as parties in privity, about the manner of filling out and using the form, and 2) any custom or practice regarding the issuance of partial lien waivers that would imply an understanding between Diversified and Grubbs. Both aspects are factual issues to be resolved at trial. *Alpha Elec. Supply, Inc. v. F. Feaster, Inc.*, 386 So.2d 594 (Fla.App.1980).

Diversified has formulated the issue as one of custom and practice in the trade, such that Grubbs could not claim detrimental reliance on forms that Grubbs should have interpreted as Diversified intended. Diversified's credit manager maintains in his deposition that partial lien releases were issued for Allied, not for Grubbs, and that what Allied did with them or whether Grubbs relied on them was up to Allied, not Diversified. The following excerpt from

**2.** In part, there is a dispute as to how prominently the effective date was placed on the waiver form. On neither waiver form was it labeled as such, and each waiver form had only one official space for a date: the date of signing.

Diversified's credit manager's deposition is revealing:

Q Now, I'm just asking you, based on your experience, sir, whether you think a general contractor when he's given two separate releases of lien, dated separate dates, would be reasonable in assuming that those releases did not cover the same material sold?

A Between October 26th and November 15th?

Q Yes, sir.

A Well, the contractor should know. I gave those to Rocky [Allied's president], those releases. Now, it's up to Rocky to see to it that the general contractor gets a copy of them. I assume he got the copies of the releases.

Unless the general contractor calls me directly and says I need a release on the money that we put toward that job, on the $10,000. Now, during that period of time there between October 26th and November 15th, Rocky just came back and asked me for another release with that $10,000 one.

Q Now—

A The first one was $10, which is a partial—which is a normal procedure when people request partial releases of liens. They don't want people to know how much money the general contractor—he doesn't want the general contractor to know how much they're paying their supplier. So we put $10 up there, which is perfectly legal on a partial release of lien.

Now, why I made our two, I don't know, sir. I'll have to research my records to see why I gave two on that project, but we only received the one payment, the $10,000.

Beyond the credit manager's deposition, there is very little on the record explaining the customary practice of issuing partial lien waivers for construction projects. The rationale for signing lien waivers covering payments of $10.00, of which Allied received many from suppliers in addition to Diversified, is not conclusive, is possibly suspect, and fails to answer Aetna's reliance argument. Even if there were a clear understanding of customary practice about dates on forms, there would still be ambiguity as to why there were two lien waivers with the same effective date. It appears that it is also customary to issue only one partial lien waiver per pay period. The credit manager from Diversified admitted that he did not know offhand why there were two partial waivers with the effective date of August 31; he would have to look back at his records. The extent of his explanation was that both waivers were requested by Allied's president.

If the issuance of two partial waivers in one month is inherently suspect, Aetna may have good reason to argue that Grubbs was not obligated to note the overlap and should not suffer because of such an irregularity. However, if the issuance of two partial lien waivers in one month is not inherently suspect, then it may be a matter of harmful reliance by Grubbs, not harmful activity by Diversified. But even if the two partial lien waivers were a matter of Diversified's negligence or idiosyncrasy rather than custom, there is a dispute as to whether Grubbs paid Allied more than Grubbs should have, or more than Grubbs would have if Grubbs had realized that both waivers covered the same pay period. Diversified maintains that Aetna has presented no statement by Grubbs showing that any payment was actually made because of a mistaken belief.

There appear to be substantial issues of fact remaining, specifically as to the payment responsibility at the end of the paper trail. However, to preclude summary judgment, these issues must be not only substantial but also material. If under the Miller Act the only relevant consideration is the fact that Diversified did not receive full payment for its steel deliveries, any remaining factual dispute would be immaterial. The clearly stated purpose of the Miller Act is to protect suppliers of labor and material for public projects. *F.D. Rich Co.*, 417 U.S. at 124, 94 S.Ct. at 2162. Thus, the materiality of any remaining issues of fact is inversely related to the degree of remedial protection for the supplier. While the protection is great, how-

ever, it is not absolute. A number of cases have estopped Miller Act claims where responsibility for nonpayment was traced to supplier negligence or fraud. *See, e.g., Graybar Elec. Co. v. John A. Volpe Construction Co.,* 387 F.2d 55, 59 (5th Cir. 1967); *United States v. Monaco & Son, Inc.,* 336 F.2d 636 (4th Cir.1964). Where the supplier's irresponsibility was great enough, these courts have held that loss should go to the one who made the loss possible.

■ The appropriate test is articulated in *Graybar:* whether the contractor "did everything it reasonably could to protect itself short of completely taking over the operation of [the subcontractor]." 387 F.2d at 60. Thus, if Grubbs made progress payments on the fully reasonable assumption that Allied was continuing the flow of money, then Diversified may not have a full claim against Aetna. However, it is unclear on the basis of customary practice whether Diversified or Grubbs was more negligent in allowing the loss. Moreover, even if Diversified had been negligent, a further judgment would need to be made as to whether that negligence were sufficient to estop relief from Aetna.[3] If the district court were to find that the waiver forms are unambiguous on their face, then the unambiguous terms would prevail, rather than any other construction a party might have read into the terms. *Frank Maio General Contractor, Inc. v. Consolidated Electric Supply, Inc.,* 452 So.2d 1092 (Fla.App.1984). Clearly, the reasonableness of Grubbs' reliance, if not the reliance itself, is in dispute. This Court must reverse the summary judgment for resolution of that factual issue and any other material factual issues remaining, so that the district court may determine whether Aetna is shielded from the Miller Act by Grubbs' detrimental reliance.

■ Aetna moved to file an amended answer prior to the summary judgment. In rendering summary judgment, the district court denied Aetna's motion as moot. However, on the record before this Court, the facts in dispute are material to precisely the additional affirmative defense Aetna wished to append: Diversified's negligence in issuing two partial waivers of lien. Fed. R.Civ.P. 15(a) states that "leave [to amend] shall be freely given when justice so requires." This Circuit has accepted a policy of liberal amendment. *Longhan v. Firestone Tire & Rubber Co.,* 749 F.2d 1519 (11th Cir.1985); *Dussouy v. Gulf Coast Investment Corp.,* 660 F.2d 594 (5th Cir. Nov.1981). Failure to grant leave to amend would overdo the "salutory effect of summary judgments in Miller Act cases." *Continental Casualty,* 414 F.2d at 435. Aetna should be granted leave to amend its answer as this case moves to trial.

We now turn to the question of attorneys' fees. Diversified has been granted attorneys' fees for the full amount requested, a total of $5,524.00 for 72.6 hours. Although our reversal of the summary judgment below obviates the issue at this stage of the proceedings, a few comments now may be relevant for later proceedings.

The Miller Act does not itself provide for attorneys' fees. The Supreme Court decided that, in the absence of statutory or contractual guidance, the commercial aspect of Miller Act cases should not allow an exception to the American Rule: Parties must pay their own ways as far as legal costs. *F.D. Rich Co.,* 417 U.S. 116 at 128–31, 94 S.Ct. 2157, 2164–66, 40 L.Ed.2d 703 (1974). In this case there are contractual terms that designate attorneys' fees. All delivery tickets for the steel stated in the sales agreement on the back and all invoices stated that the supplier could recover attorneys' fees in case of nonpayment for the goods. But, although such statements

---

**3.** We emphasize that a finding of estoppel would place the burden on Diversified in contravention of the Miller Act's stated purpose and despite any reasonable reliance Diversified might have placed on Miller Act protection. In effect, such a decision would make Diversified responsible for monitoring its purchaser, rather than making Grubbs responsible for monitoring its subcontractor. This goes against the wisdom behind the Miller Act that, by virtue of being able to choose subcontractors, a general contractor qua surety should be responsible for any nonpayment. Thus, a finding of estoppel should not come lightly.

are considered enforceable terms of agreement, UCC § 2–207, this agreement was between Diversified and Allied, not Diversified and Grubbs. The delivery ticket and invoice agreement as to attorneys' fees do not themselves encompass Grubbs and therefore Aetna, but Diversified is also sufficiently removed from Grubbs that one would not expect an agreement to be made between Diversified and Grubbs. However, the core question is whether the attorneys' fees are part of the protection a surety owes a supplier under the Miller Act.

■ We return to the Supreme Court's reasoning in *F.D. Rich* and note the unwillingness of the Court to include attorneys' fees as part of the sum to make the supplier whole. 417 U.S. at 130–31, 94 S.Ct. at 2165–66. With no express agreement between Diversified and Grubbs, nor any express agreement between Allied and Grubbs on behalf of Diversified, it would be inappropriate to create an exception to the American Rule in this case. Diversified must carry its own attorneys' costs. Thus, the district court incorrectly awarded attorneys' fees in the context of rendering summary judgment. Should Diversified be granted relief at the end of trial, the same rationale would apply, and attorneys' fees should not be included as part of that relief.

This Court finds remaining genuine and material factual issues pertaining to the two partial waivers of lien. There should be no summary judgment until these are resolved. The subsequent assessment of whether Aetna has a valid claim of estoppel should be undertaken with the remedial intent of the Miller Act in mind. We REVERSE and REMAND for further proceedings in accordance with this opinion.