**OKI AMERICA, INC.,**
**Plaintiff–Appellee,**

v.

**MICROTECH INTERNATIONAL, INC.,**
**Defendant–Appellant.**

**No. 88–1561.**

United States Court of Appeals,
Ninth Circuit.

Submitted Jan. 9, 1988.*

Decided April 7, 1989.

---

* The panel finds this case appropriate for submission without oral argument pursuant to Ninth Circuit Rule 34–4 and Fed.R.App.P. 34(a).

Russell J. Hanlon, Berliner, Cohen & Biagini, San Jose, Cal., for defendant-appellant.

James E. Jackson, Cupertino, Cal., for plaintiff-appellee.

Before BROWNING, BEEZER and KOZINSKI, Circuit Judges.

PER CURIAM:

The trial court granted Oki summary judgment on Microtech's counterclaim for the bad faith denial of the existence of a contract. Microtech appeals, claiming a genuine dispute of material fact exists as to whether Oki denied the existence of the contract.

■ The elements of this tort are: (1) the denial of the existence of a contract (2) in bad faith, and (3) without probable cause. *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.,* 36 Cal.3d 752, 769, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984). Mere denial of liability under a contract does not suffice; the defendant must deny the existence of the contract. *Quigley v. Pet, Inc.,* 162 Cal.App.3d 877, 890–92, 208 Cal.Rptr. 394 (1984).

Summary judgment is reviewed *de novo. Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986). We must determine, viewing the evidence in the light most favorable to Microtech, whether any genuine issue of material fact exists and whether Oki was entitled to judgment as a matter of law. *Ashton v. Cory,* 780 F.2d 816, 818 (9th Cir.1986).

■ First, Microtech notes Oki asserted as an affirmative defense that "[t]here was no contract entered into between the parties." Although pleadings may give rise to authorized admissions under Fed.R.Evid. 801(d)(2)(C) and be considered despite the hearsay rule, 4 D. Louisell & C. Mueller, *Federal Evidence* § 425, at 302 (1980), this pleading is not an admission. Oki alleged three mutually inconsistent affirmative defenses: (1) no contract existed, (2) course of dealing and usage of trade permitted it to "cancel its performance at any time prior to 30 days before shipment date," and (3) performance was legally impossible.

Such inconsistent pleading is permissible under Fed.R.Civ.P. 8(e)(2). Therefore, as the Fifth Circuit has ruled, "one of two inconsistent pleas cannot be used as evidence in the trial of the other" because a contrary rule "would place a litigant at his peril in exercising the liberal pleading ... provisions of the Federal Rules." *Continental Ins. Co. v. Sherman,* 439 F.2d 1294, 1298–99 (5th Cir.1971); *see also* 4 D. Louisell & C. Mueller § 425, at 306 & n. 75. In addition, this pleading is not sufficient to establish the elements of the tort: "once litigation has commenced, the actions taken in its defense are not ... probative of whether [a] defendant in bad faith denied the contractual obligation prior to the lawsuit." *Palmer v. Ted Stevens Honda Inc.,* 193 Cal.App.3d 530, 539, 238 Cal.Rptr. 363 (1987).

Second, Microtech relies on Oki's affirmative defense that there existed between the two parties "a course of dealing which allowed the party issuing a purchase order to cancel its performance at any time prior to 30 days before shipment date." This evidence fails for the same reasons as Microtech's reliance on Oki's affirmative defense that there was no contract between the two parties. In addition, an assertion the *terms* of a contract preclude relief is not a denial of the *existence* of the contract.

Third, Microtech points to testimony of Oki's Vice President of Sales that he believed Oki or Microtech could unilaterally cancel the contract at any time for any reason. This, too, is evidence of Oki's view of the meaning of contract terms rather than of its refusal to acknowledge the contract.

Fourth, Microtech relies on the underscored portion of the following quotation from a letter Oki's president wrote Microtech:

*While I appreciate your belief that you have a binding contract,* I must also respectfully argue that our agent, Advanced Design Group, clearly described our pricing dilemma on its quote of December 9, 1985. As you have acknowledged, you accepted our quote in your purchase order and this note was a prominent and in fact crucial part of that quote. Therefore we feel strongly that you accepted the price renegotiation language.

Read in context, this letter provides no support for Microtech's assertion Oki denied the existence of the contract. Rather, the letter disputes Microtech's view of the terms of the contract.

Finally, Microtech offers the testimony of a third party that an Oki sales manager told him "Oki had no intentions o[f] delivering the product at the prices that they agreed upon" and that "Oki never had a written contract stating the firm prices over the schedule of the contract." This conceded hearsay, Microtech submits, is admissible under Fed.R.Evid. 801(d)(2)(D) as the admission of a party's agent.

As proponent of this evidence, Microtech must demonstrate it is "a statement by [Oki's] agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D); *Breneman v. Kennecott Corp.,* 799 F.2d 470, 473 (9th Cir.1986). This Microtech failed to do. On the contrary, the sales manager testified "Microtech was not in my geography. I knew nothing about Microtech as a customer with regard to anything." Since the sales manager's statement did not concern a matter within the scope of his employment as Rule 801(d)(2)(D) requires, *see Breneman,* 799 F.2d at 473, testimony regarding his statement is inadmissible.

Microtech failed to identify any admissible evidence that Oki denied the existence of the contract. Summary judgment for Oki was therefore appropriate.

AFFIRMED.

KOZINSKI, Circuit Judge, concurring:

Nowhere but in the Cloud Cuckooland of modern tort theory could a case like this have been concocted. One large corporation is complaining that another obstinately refused to acknowledge they had a contract. For this shocking misconduct it is

demanding millions of dollars in punitive damages. I suppose we will next be seeing lawsuits seeking punitive damages for maliciously refusing to return telephone calls or adopting a condescending tone in inter-office memos. Not every slight, nor even every wrong, ought to have a tort remedy. The intrusion of courts into every aspect of life, and particularly into every type of business relationship, generates serious costs and uncertainties, trivializes the law, and denies individuals and businesses the autonomy of adjusting mutual rights and responsibilities through voluntary contractual agreement.

## I

In inventing the tort of bad faith denial of a contract, *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 686 P.2d 1158, 206 Cal.Rptr. 354 (1984), the California Supreme Court has created a cause of action so nebulous in outline and so unpredictable in application that it more resembles a brick thrown from a third story window than a rule of law. *Seaman's* gives nary a hint as to how to distinguish a bad faith denial that a contract exists, from a dispute over contract terms, from a permissible attempt to rescind a contract, or from "a loosely worded disclaimer of continued contractual responsibility." *Quigley v. Pet, Inc.*, 162 Cal. App.3d 877, 890, 208 Cal.Rptr. 394 (1984).

Small wonder: It is impossible to draw a principled distinction between a tortious denial of a contract's existence and a permissible denial of liability under the terms of the contract. The test—if one can call it such—seems to be whether the conduct "offends accepted notions of business ethics." *Seaman's*, 36 Cal.3d at 770, 206 Cal. Rptr. 354, 686 P.2d 1158. This gives judges license to rely on their gut feelings in distinguishing between a squabble and a tort. As a result, both the commercial world and the courts are needlessly burdened: The parties are hamstrung in developing binding agreements by the absence of clear legal principles; overburdened courts must adjudicate disputes that are incapable of settlement because no one can predict how—or even by what standard—they will be decided.

*Seaman's* throws kerosene on the litigation bonfire by holding out the allure of punitive damages, a golden carrot that entices into court parties who might otherwise be inclined to resolve their differences. Punitive damages once were reserved for truly outrageous conduct; even then, awards were relatively small. *See, e.g., Lanigan v. Neely*, 4 Cal.App. 760, 89 P. 441 (1907) (punitive damages awarded for breach of promise of marriage when plaintiff's reliance on the promise resulted in pregnancy); *Scheps v. Giles*, 222 S.W. 348 (Tex.Civ.App.1920) (punitive damages awarded for wrongful discharge where employer publicly called employee a liar and ordered her out of his sight). Today punitive damages are obtained in cases involving fairly innocuous conduct, *see, e.g., April Enters., Inc. v. KTTV*, 147 Cal.App. 3d 805, 195 Cal.Rptr. 421 (1983) (plaintiff sued defendant for erasing videotapes of television shows, although the contract explicitly authorized such erasure; jury awarded $14 million in punitive damages); *Klimek v. Hitch*, 124 Ill.App.3d 997, 80 Ill.Dec. 289, 464 N.E.2d 1272 (1984) (landowner sued his neighbor for trespass and destruction of a hedgerow; court awarded $10 compensatory damages and $14,500 punitive damages), often in amounts that seem to be limited only by the ability of lawyers to string zeros together in drafting a complaint.

This tortification of contract law—the tendency of contract disputes to metastasize into torts—gives rise to a new form of entrepreneurship: investment in tort causes of action. "If Pennzoil won $11 billion from Texaco, why not me?" That thought must cross the minds of many enterprising lawyers and businessmen. A claim such as "defined" by *Seaman's* is a particularly attractive investment vehicle: The potential rewards are large, the rules nebulous, and the parties unconstrained by such annoying technicalities as the language of the contract to which they once agreed. Here, for example, the contract was largely beside the point. Microtech instead relied on statements in Oki's plead-

ings, rumors racing through the Oki grapevine, and a letter in which Oki's president offers his interpretation of the contract. On the basis of these minutiae, Microtech stakes its claim to $600,000 of compensatory damages and $2.5 million in punitive damages. And why not? Even a one in ten chance of winning would justify an investment of over $300,000 in attorney's fees.

As this case illustrates, business relationships are complex organisms, not always as neatly structured as one could wish for. The record presents plausible support for both sides insofar as the contract dispute is concerned. That issue settled early in the litigation, everyone presumably having learned a valuable lesson on the need to tidy up business relationships.

But the case drags on, kept alive by Microtech's vain hope of parlaying a business squabble into a $3.1 million gold mine. The judicial machinery keeps churning, fueled by the energies of the lawyers, the parties, a district judge, three appellate judges, their respective staffs and other myriad components of the judicial process. One shudders to imagine the resources that would be consumed in adjudicating a more colorable *Seaman's* case. We surely have more pressing claims on our limited resources—safeguarding the environment, protecting the rights of the accused, preventing encroachments on constitutionally protected liberties, to name a few—than helping Microtech soothe its bruised feelings over a quarrel with its supplier.

## II

The eagerness of judges to expand the horizons of tort liability is symptomatic of a more insidious disease: the novel belief that any problem can be ameliorated if only a court gets involved. Not so. Courts are slow, clumsy, heavy-handed institutions, ill-suited to oversee the negotiations between corporations, to determine what compromises a manufacturer and a retailer should make in closing a mutually profitable deal, or to evaluate whether an export-import consortium is developing new markets in accordance with the standards of the business community. *See generally* Snyderman, *What's So Good About Good Faith? The Good Faith Performance Obligation in Commercial Lending*, 55 U.Chi.L.Rev. 1335, 1361 (1988).

Moreover, because litigation is costly, time consuming and risky, judicial meddling in many business deals imposes onerous burdens. It wasn't so long ago that being sued (or suing) was an unthinkable event for many small and medium-sized businesses. Today, legal expenses are a standard and often uncontrollable item in every business's budget, diverting resources from more productive areas of entrepreneurship. Nor can commercial enterprises be expected to flourish in a legal atmosphere where every move, every innovation, every business decision must be hedged against the risk of exotic new causes of action and incalculable damages. *See generally* P. Huber, *Liability: The Legal Revolution and its Consequences* 153–71 (1988).

Perhaps most troubling, the willingness of courts to subordinate voluntary contractual arrangements to their own sense of public policy and proper business decorum deprives individuals of an important measure of freedom. The right to enter into contracts—to adjust one's legal relationships by mutual agreement with other free individuals—was unknown through much of history and is unknown even today in many parts of the world. Like other aspects of personal autonomy, it is too easily smothered by government officials eager to tell us what's best for us. The recent tendency of judges to insinuate tort causes of action into relationships traditionally governed by contract is just such overreaching. It must be viewed with no less suspicion because the government officials in question happen to wear robes.

## III

Fortunately, the tide seems to be turning. The California Supreme Court is once again leading the way. *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 765 P.2d 373, 254 Cal.Rptr. 211 (1988), has taken a bite out of *Seaman's* by holding that tort

remedies are not available for breach of the implied covenant of good faith and fair dealing in an employment contract. *Moradi–Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal.3d 287, 758 P.2d 58, 250 Cal.Rptr. 116 (1988), revived the common sense rule that third parties cannot sue insurers for unfair insurance practices, overruling *Royal Globe Ins. Co. v. Superior Court*, 23 Cal. 3d 880, 592 P.2d 329, 153 Cal.Rptr. 842 (1979).

But much remains to be done. As this case demonstrates, *Seaman's* is a prime candidate for reconsideration. Others come to mind: *Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal.2d 33, 442 P.2d 641, 69 Cal.Rptr. 561 (1968) (rejecting the notion that a contract can ever have a plain meaning); *Casey v. Proctor*, 59 Cal.2d 97, 109, 378 P.2d 579, 28 Cal.Rptr. 307 (1963) (holding that a release of unknown claims has no effect in the absence of evidence "apart from the words of the release"); and *April Enters., Inc. v. KTTV*, 147 Cal.App.3d 805, 195 Cal.Rptr. 421 (1983) (holding that a party can be liable in tort for actions authorized by the contract). At long last, however, we seem to be moving in the right direction.