UNITED STATES of America, for the Use and Benefit of BALZER PACIFIC EQUIPMENT COMPANY, Plaintiff–Appellee,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Defendant–Appellant.

No. 88–15464.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 31, 1989.

Decided Jan. 31, 1990.

James H. Lawhn and Charles J. Keever, Oliver, Lee, Lawhn, Ogawa and Lau, Honolulu, Hawaii, for defendant-appellant.

W. Thomas Fagan and Patricia K. Wall, Reinwald, O'Connor and Marrack, Honolulu, Hawaii, for plaintiff-appellee.

Before SNEED, KOZINSKI and THOMPSON, Circuit Judges.

SNEED, Circuit Judge:

Fidelity and Deposit Company of Maryland (F & D) appeals from a jury verdict of $66,082.54 in favor of Balzer Pacific Equipment Company (Balzer). F & D asserts that the trial court erred in denying its motion for a directed verdict, as well as in denying its motion for judgment n.o.v., and, alternatively, for a new trial. We reverse and remand for a new trial.

## I.

### *JURISDICTION*

Jurisdiction in the district court resides in 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291.

## II.

### *FACTS AND PROCEEDINGS BELOW*

Balzer brought this action under the Miller Act, 40 U.S.C. §§ 270a–270d, against F & D on payment bonds issued by F & D in respect to four contracts between S & S Contracting, Inc. (S & S) and the United States to be performed principally in Guam. These contracts were for construction of (1) an airport, (2) a highway, (3) a park memorial, and (4) work for the Navy in Midway. Balzer furnished material to S & S to be used both in connection with these contracts and for several contracts S & S had with parties other than instrumentalities of the United States. S & S became insolvent and was unable to meet its obligations owed to Balzer. This action ensued.

To perform its federal and non-federal projects, S & S needed to mine and process limestone on Guam as a component of pavement. S & S thereupon moved a rock crusher from Samoa to Guam that it had previously purchased from Balzer. S & S also bought from Balzer an asphalt plant and additional crushing equipment that it placed at a limestone quarry in Guam. S & S's operations also employed a cement mixer and two Bomag rollers which were mobile and taken to the job sites. Balzer furnished material and parts for each of these pieces of equipment in amounts stipulated to by Balzer and F & D.

The difficulty which provides the genesis of this lawsuit is that neither Balzer nor S & S attempted to maintain any records that would enable the apportionment of specific materials and parts to each specific contract as to which F & D issued its payment bonds. Balzer insists that such apportionment is not necessary; it is enough for it to show that it reasonably believed that all the stipulated items were to be used in bonded federal projects. F & D argues that there must be an apportionment of specific materials to each contract before it becomes liable on any payment bond issued as to the four federal projects.

The district court ruled in favor of Balzer and incorporated that ruling in its instructions to the jury. *E.g.* Instructions No. 4,[1] 5,[2] 6,[3] and 7.[4] In its "Memorandum and

---

1. Instruction No. 4 stated:
     To recover from Fidelity and Deposit Company under the Miller Act, Balzer must show the following by a preponderance of the evidence:
     1) That Balzer supplied materials in prosecution of the work provided for in the contracts bonded by Fidelity and Deposit;
     2) That Balzer has not been paid for those materials; and
     3) That Balzer in good faith had reason to believe that the materials were intended for the work specified in the contracts and covered by Fidelity and Deposit's bonds.

2. Instruction No. 5 stated:
     The Miller Act allows recovery only for those items which constitute materials. The Miller Act does not protect the vendor of capital equipment.

For purpose of the Miller Act, the concept of "materials" includes things which will be incorporated into the project itself. The concept of materials also includes things that are expendable, or reasonably expected to be consumed, or substantially consumed, in the performance of the work covered by the bonded contract. The concept of "capital equipment" includes things which may reasonably be expected to be removed by the contractor and used in subsequent jobs, but something which is reasonably expected to have no utility or economic value to the contractor after the completion of the work may be classified as material.

The extent of expected consumption of supplies is to be viewed from Balzer's point of

Order," the court concluded "that to require Balzer to prove that it had a reasonable belief that the use of each item supplied was for one specific job of the four contracts, or to apportion its claims among the four contracts, would place an insurmountable burden on Balzer in light of the record keeping of S & S Contracting and the nature of the use to which Balzer's equipment or materials were put."

F & D argues vigorously that apportionment to each bonded contract is required by the language of the Miller Act, the cases interpreting the Act, and the need to preclude "cross-collateralization." Cross-collateralization occurs when the protection afforded by one bond is available to provide protection with respect to supplies in fact furnished on a different contract in excess of the coverage provided by the bond applicable to this latter contract.

### III.

### STANDARD OF REVIEW

The issues presented by this appeal are questions of law; therefore, our review is de novo. *United States v. McConney*, 728

view. If Balzer reasonably expected that supplies furnished would be substantially consumed, or used up, in the four contracts bonded by Fidelity and Deposit, then Balzer is entitled to recover. It does not matter whether or not the materials were actually consumed or used up. Balzer must show that it had a reasonable expectation by a preponderance of the evidence and it must therefore produce some reliable evidence from which it would have been reasonable for a supplier in Balzer's position to expect that the particular item would have been substantially consumed in the bonded contracts.

3. Instruction No. 6 stated:
   Balzer may recover the cost of supplies furnished to S & S which become part of S & S's capital equipment only if the supplies were reasonably expected by Balzer to be substantially used up or worn out in the work to be performed under the bonded contracts and would not add substantially to the value of the equipment and be usable on other jobs. Balzer does not, however, have to trace items after they left its control and show that they were actually consumed on the jobs; it need only show that it reasonably expected the supplies furnished to S & S to be substantially used or consumed on the jobs bonded by Fidelity and Deposit Company.

F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

### IV.

### DISCUSSION

#### A. The Miller Act

■ Quite correctly F & D points out that the Miller Act's language speaks in the singular when using the term "payment bond" and "contract," *see* 40 U.S.C. § 270a, b, and c, and that no provision exists therein to aggregate the amounts of the bonds applicable to several contracts even when such contracts pertain to related projects. Claims that exceed the penal sum of a particular bond must be paid on a pro rata basis. *See generally Pennsylvania Fire Ins. Co. v. American Airlines, Inc.*, 180 F.Supp. 239 (E.D.N.Y.1960).

Balzer argues to the contrary on the basis of cases that have held that the supplier of materials need not prove that all such materials were actually delivered to the site of the bonded work and incorporated therein so long as it had a good faith

Repair parts, appliances, accessories or other maintenance items which add materially to the value of the equipment and render it available for other work are not within the coverage of the payment bond provided for in the Miller Act. However, repair parts, appliances, accessories, or other maintenance items which are necessary to, and are substantially consumed in, the performance of work under a bonded contract, and current repairs which do not add substantially to the value of the equipment and compensate only for ordinary wear and tear, are within the coverage of the Miller Act bond.

4. Instruction No. 7 stated:
   I have mentioned that Balzer can recover on the Miller Act bond only if it shows that it had a reasonable, good faith belief that labor and materials it provided S & S were intended for the work specified in the federal contracts covered by Fidelity and Deposit's bonds. Balzer must show this by a preponderance of the evidence, and it must therefore produce some reliable evidence from which it would have been reasonable for a supplier in Balzer's position to expect that the particular services or supplies claimed were furnished in the prosecution of the work specified in the bonded contracts.

and reasonable belief that the material was intended for use in the bonded federal project. *See, e.g., United States ex rel. Martin Steel Constructors, Inc. v. Avanti Constructors, Inc.,* 750 F.2d 759, 761 (9th Cir.1984), *cert. denied,* 474 U.S. 817, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985) (hereinafter *"Martin Steel"*); *United States ex rel. I. Burack, Inc. v. Sovereign Constr. Co.,* 338 F.Supp. 657, 660 (S.D.N.Y.1972); *United States ex rel. Tom P. McDermott, Inc. v. Woods Constr. Co.,* 224 F.Supp. 406, 409 (N.D.Okla.1963).

The district court was partially correct when it incorporated the "reasonable good faith" standard in its jury charges. *See, e.g., United States ex rel. Krupp Steel Prod., Inc. v. Aetna Ins. Co.,* 831 F.2d 978, 980 (11th Cir.1987) (finding that supplier delivered goods to job site in good-faith belief that they were being used for bonded project). For example, in "Instruction No. 4," the jury was told that Balzer was required to show, among other things, that it "in good faith had reason to believe that the materials were intended for the work specified in the *contracts* and covered by Fidelity and Deposit's *bonds."* (Emphasis added.)

The italicized words reveal the heart of this case. The error of Balzer and the trial court consists of expanding the "reasonable good faith" standard to embrace all possibly applicable payment bonds issued by the same surety rather than restricting it to resolve doubts about whether the supplies were used on the specific bonded job, or on a job bonded by another surety, or on an unbonded one. To extend the "reasonable good faith" standard in this manner alters each of the contracts entered into by the surety and converts them into one contract that provides for a penal sum equal to the aggregate sum of the several bonds. This approach also makes that sum available with respect to any defaults by the contractor arising out of any of the work pursuant to any of the contracts with the

United States. No such result is envisioned by the Miller Act.

In its Memorandum and Order, the district court justified this remaking of the payment bond contracts between F & D and S & S on the basis that the latter kept no records that would enable S & S or Balzer to allocate "the use of equipment and supplies at the quarry to any one particular job." Under these circumstances the court felt Balzer should be permitted to proceed against the four bonds restricted only to establishing that it had a good faith belief that the materials were furnished to enable the contractor to perform one or more of the jobs for which bonds were issued by F & D. That is, "the balance of equities favored Balzer."

■ The district court, in our opinion, overlooked Balzer's opportunity to have insisted on better accounting by S & S. It should not have been difficult for S & S to have maintained a record of the time and the amount of pavement that was laid down on each particular contract with the government. Indeed, it very likely estimated the amount that would be required before entering the contract with the United States. Fixing the time would require only rudimentary records. Since the equipment and supplies furnished by Balzer were to process limestone for use as a component of pavement, the amount and time of pavement supplied per contract would have been a means by which supplies could be allocated to specific contracts. Balzer cannot use its failure to insist on a modest amount of cost accounting by S & S to justify its demand that the contracts into which F & D and S & S entered be fused into one for its benefit.[5]

We are mindful that F & D requested several jury instructions that insist on a greater precision in allocating materials to specific contracts with the United States than does the allocation method just suggested. *E.g.,* Requested Instructions No. 7 [6] and 11.[7] We do not demand that level

---

**5.** Judge Kozinski's dissent, which would deny recovery to Balzer, ignores the unique circumstances that gave rise to this litigation. Because of these unusual facts, we do not anticipate that the apocalyptic consequences he forecasts will occur.

**6.** F & D unsuccessfully requested the following instruction as No. 7: "The most important

of precision under the circumstances of this case. Our quarrel essentially is with the district court's fusion of four contracts into one, rather than insisting on a reasonable allocation method, to solve the difficulties presented by the facts of this case.

### B. *Case Law Relied on by F & D*

F & D relies on our opinion in *Martin Steel,* 750 F.2d at 761, to fix the elements a claimant on a Miller Act payment bond must establish to recover. These are:

(1) the materials were supplied in prosecution of work provided for in the contract;

(2) claimant has not been paid;

(3) he had a good faith belief that the materials were intended for the specified work; and

(4) the jurisdictional requisites have been met.

■ It is obvious that Balzer has not been able to establish what specific material was supplied for use on what specific contract. On the other hand, F & D overstates the demands of the initial requirement when it argues that any supplies that are intended to be used on two or more jobs constitute, ipso facto, an irrecoverable "capital expense" and not recoverable "material." As previously indicated, we only require (1) a reasonable belief on the part of the materialman that the supplies for

which he seeks payment will have been consumed on the work of the bonded contracts as a group and (2) a reasonable belief that the amount allocated by him to each contract is a proper amount. We believe this is consistent with the fundamental distinction between "materials" and "capital expense" as marked out by *United States ex rel. Sunbelt Pipe Corp. v. United States Fidelity and Guar. Co.,* 785 F.2d 468, 470–71 (4th Cir.1986), on which F & D relies. Moreover, it will enable the materialman to establish that he has not been paid and that he had a good faith belief that the materials were intended for "specific work." [8]

■ Compliance with the jurisdictional requirement also is facilitated by the approach we adopt. The Miller Act, 40 U.S.C. § 270b(b), requires that suit under the Act be brought within one year "after the day on which the last of the labor was performed or material was supplied by him." The last day on which material was supplied under the facts of this case would be the last day on which Balzer delivered to S & S limestone, or furnished S & S supplies attributable to maintaining the cement mixer and the Bomag rollers, and as of which date Balzer could establish a reasonable belief that a portion of the limestone and supplies would be used in one of the four jobs. For example, if one of the jobs had been completed on a given date that Balzer

---

factor in distinguishing materials from capital equipment has been substantial consumption— the degree of expected consumption of the items on the particular job for which they were furnished." (Citing *United States ex rel. J.P. Byrne & Co. v. Fire Assoc. of Philadelphia,* 260 F.2d 541, 544–45 (2d Cir.1958)).

**7.** F & D unsuccessfully requested the following instruction as No. 11: "It is not sufficient for Balzer to believe that the materials were intended for bonded work in general. In order to recover, Balzer must prove the specific project which each invoice was believed to be for." (Citing *St. Paul–Mercury Indem. Co. v. United States ex rel. H.C. Jones,* 238 F.2d 917, 924–25 (10th Cir.1956)).

**8.** In his dissent, Judge Kozinski contends that this rule will promote uncertainty by sureties. We view his approach as creating just as great a possibility of uncertainty. He suggests that under a "single project" approach, a surety will

have a "rational basis for determining whether supplies are material." Dissent Op., at 553. But given his definition of capital equipment as anything retaining value at the end of a project, a surety will be equally "hard-pressed to figure out exactly what it is insuring," *id.,* if in the ordinary course of business, certain materials may be but are not necessarily always used up in a single project.

Moreover, Judge Kozinski overlooks the fact that by accepting part two of the above rule, the danger of confusing a capital expenditure with an ordinary expense is substantially eliminated. A contractor's purchase of sufficient widgets to supply the needs of two jobs, one bonded and one not, should not deprive the seller of the protection provided by the bond on the one job because the remainder of the widgets are used on the unbonded job. Obviously the above rule does not extend to items that accountants customarily regard as capital expenditures such as buildings, land, heavy construction equipment, etc.

furnished limestone or supplies to S & S, it could not establish a reasonable belief that as of that date the items it delivered would be used in the completed job. For jurisdictional purposes pertaining to such a completed job, Balzer would have to pull back the starting date of the one-year limitations period to a time when it could establish a reasonable belief that a portion of what it delivered to S & S was to be used at that job.

This avoids permitting the last day material furnished with respect to bonded Job B from being used to fix the jurisdictional limit for material furnished on an earlier Job A, a result condemned in *United States ex rel. Grotnes Machine Works, Inc. v. Henry B. Byors & Son, Inc.*, 454 F.Supp. 203, 205–06 (D.N.H.1978), on which F & D heavily relies in its insistence on its specific-material-specific-contract approach.

It may be that Balzer can no more make its case under the principles we propound than it could under F & D's approach. We believe, however, that it is entitled on remand to attempt to do so. The Miller Act is "highly remedial" and entitled to a "liberal" construction, *J.W. Bateson Co. v. United States ex rel. Board of Trustees*, 434 U.S. 586, 594, 98 S.Ct. 873, 877, 55 L.Ed.2d 50 (1978), and it is in furtherance of those principles that we remand this case for a new trial.

REVERSED AND REMANDED.

KOZINSKI, Circuit Judge, dissenting in part:

This case presents three related legal issues stemming from a single set of facts. Balzer supplied to a contractor, S & S, certain items that Balzer reasonably believed would be used during the course of four U.S. Government construction projects. Defendant Fidelity had bonded the projects under four separate Miller Act bonds.

The first issue concerns the determination of general Miller Act liability when items are supplied to more than one bonded project. The district court held that the projects could be lumped together, so that if Balzer reasonably believed that its sup-

plies would be used on any one of the projects, Fidelity would be liable. The majority, quite correctly, concludes that this was wrong; liability is determined on a contract-by-contract basis.

The second issue involves the statute of limitations. Here again, the majority rejects the district court's single-pie theory, holding that each bonded contract is a separate event for purposes of triggering the statute. I fully agree with this portion of the majority opinion as well.

Oddly, the majority adopts the converse theory in resolving the third question: whether supplies are material or capital equipment. Without explanation, the majority concatenates the four projects, holding that supplies are material so long as the supplier reasonably believes they will be consumed in the projects *as a group*. It makes no sense to me to adopt a global approach on this issue while applying a balkanization rule to the first two. The three issues are obviously related; if consistent theories were applied, proof on the first two issues could easily go to the third. The majority's unfortunate inconsistency will complicate problems of discovery and proof, and increases the danger of confusion by judge and jury. Moreover, the majority's rule will create perverse incentives for contractors and Miller Act sureties. Worse, the majority's approach is unique in the federal courts, creating a conflict with the law in at least three other circuits.

I

The Miller Act allows recovery to one who supplies "labor or material" to federal construction projects. 40 U.S.C. § 270b(a). It does not protect the supplier of capital equipment. The Miller Act provides an alternative remedy to those who would ordinarily be protected under a state mechanic's lien. See *F.D. Rich Co. v. U.S. ex rel Industrial Lumber Co.*, 417 U.S. 116, 122, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1974). Because a lien cannot attach to federal property, the Miller Act provides a substitute by requiring that all federal construc-

tion projects be bonded. Id. Suppliers of capital equipment are not protected by such bonds, because they cannot ordinarily get a mechanic's lien. See, for example, Cal Civil Code § 3110 (West, 1974); *Gordon Hardware Co. v. San Francisco & San Rafael R.R.*, 86 Cal. 620, 622, 25 P. 125 (1890).

Those who supply material to a project without receiving full payment need the protection of a mechanic's lien against the project, because an ordinary security interest is useless against material consumed in completion of the project. Suppliers of material are therefore also eligible for Miller Act protection. Suppliers of capital equipment, on the other hand, can protect themselves by taking a security interest in equipment that retains value at the end of the project. Suppliers of capital equipment are thus ineligible for mechanic's liens or Miller Act protection.

It is with this logic in mind that we must examine the distinction between material and capital equipment under the Miller Act. Judge Haynsworth explained that distinction nicely in *U.S. ex rel Sunbelt Pipe Corp. v. United States Fidelity & Guaranty Co.*, 785 F.2d 468, 470 (4th Cir.1986):

> A thing which may reasonably be expected to be removed by the contractor and used in subsequent jobs is a part of the contractor's capital equipment, but something which is reasonably expected to have no utility or economic value to the contractor after the completion of the work may be classified as material.

*Sunbelt Pipe* followed at least two other circuits in adopting this single-contract rule. See *U.S. ex rel J.P. Byrne & Co. v. Fire Association of Philadelphia*, 260 F.2d 541, 544 (2d Cir.1958) ("materials" are things "the use plaintiff and the construction company reasonably expected ... to have been substantially used up in the work under *the* contract") (emphasis added); *Massachusetts Bonding & Ins. Co. v. U.S. ex rel Clarksdale Machinery Co.*, 88 F.2d 388, 389 (5th Cir.1937) ("the supplying by sale to the contractor of equipment *which should last over several jobs* is not covered by the bond") (emphasis added).

The key to this rule is that where a bond covers a particular project, there must be a reasonable expectation that the contractor will substantially consume the supplies on *that* project in order for the supplies to constitute material and therefore be recoverable under that particular bond. Supplies that retain value at the end of a project are not covered by the Miller Act because the supplier may protect himself by taking a security interest. The rule is also consistent with a common sense notion of capital: If a contractor can use something for more than one job, it is part of the capital of his enterprise; if he uses it up in a single job, it is material.

## II

The majority adopts the contrary rule: [W]e only require (1) a reasonable belief on the part of the material man that the supplies for which he seeks payment will have been consumed on the work of the bonded contracts *as a group* and (2) a reasonable belief that the amount allocated by him to each contract is a proper amount.

Majority op at 550 (emphasis added). I have no quarrel with part two of this rule; part one is nothing but trouble.

A. As noted, the other circuits that have looked at the material/capital problem have decided to treat each bonded project separately. In these circuits, if a piece of equipment is likely to survive a particular project it is capital equipment as to that project. This is an entirely manageable rule, one that treats all suppliers and bonding companies equally and predictably.

The majority here looks to the bonded projects as a group. One problem with this rule is that it makes it hard for a surety to calculate the premium it will charge for a particular bond. If the focus is on what the contractor can reasonably be expected to consume in a single project, the surety will, at the time it calculates its premium, have a rational basis for determining whether supplies are material, and therefore covered by the bond, or capital equipment, and therefore exempt from Miller Act protection. If the focus is, instead, on

some indeterminate group of present and future projects, the surety will be hard-pressed to figure out exactly what it is insuring.[1]

Another difficulty with the majority's rule is that the number of bonded projects will almost certainly vary from contractor to contractor, and this will have a direct effect on what is considered capital equipment. Thus, if a contractor has but one bonded project, only those items likely to be consumed on that project will be deemed to be material; everything else will be capital. An identically situated contractor who devotes more of his time to government work and has, say, ten bonded projects, will find that more of his equipment is deemed to be material because many more items will wear out during ten projects than during one.

Why should these two contractors be treated differently for purposes of determining whether the items they use are material or capital under the Miller Act?[2] I can think of no reason and the majority advances none. Surely the identity or business strategy of a contractor ought to have no bearing at all on whether the supplier of a widget can recover under a Miller Act

bond. It makes far more sense to treat widgets as either material or capital regardless of how many government projects the contractor happens to have.

The majority's rule is counterproductive. The more government projects a particular contractor undertakes, the more items in his inventory will be deemed material. In the extreme, the contractor who spends all of his time on government work will have no capital equipment at all because every piece of equipment—every cement mixer, every steamroller, every petroleum distillation plant—will be consumed during the course of the bonded projects "as a group."[3] Bonding companies are not going to be oblivious to this fact; they will adjust their premiums accordingly. As a result of the majority's rule, a contractor who does little government construction will be charged a far lower premium per project than one who does a great deal of government work. The size of the Miller Act premiums will, in turn, have to be figured into the bidding price of the contract. Experienced government contractors will be put at a competitive disadvantage as against occasional or novice contractors.

1. The majority contends that it would be just as difficult for a surety to determine before the fact whether supplies will be consumed in a single project as it would be to determine whether they will be consumed in many projects. See majority op at 550 n. 8. Not so. While there is uncertainty in any prediction, an insurer has a reasonable basis for determining what supplies are likely to be consumed on *a* specific project. The insurer can have no clue as to which supplies will be consumed in an indeterminate number of future projects. The former is a business judgment, the latter a crapshoot.

2. Here, the group of projects all happened to be bonded by the same Miller Act surety. Conceivably, then, the group the majority refers to consists of all projects bonded by the same surety. Under this construction, whether something is material or capital would turn on the identity of the surety; the contractor who uses a single surety will have far more material for Miller Act purposes than one who uses several different sureties. If this is what the majority has in mind, it should say so, although this methodology is based on an equally irrational distinction: whether the several projects are bonded by a single surety or several.

3. Uncomfortable, perhaps, with the implications of its rule, the majority offers a limitation: "Obviously the above rule does not extend to items that accountants customarily regard as capital expenditures such as buildings, land, heavy construction equipment, etc." Majority op at 550 n. 8. But there is nothing at all obvious about this. With the exception of land, each of the items the majority lists is clearly covered by the rule it adopts. How then will future litigants be able to tell what is covered by the rule and what is "obviously" not? The distinction appears to turn on what "accountants customarily regard." This introduces an entirely new issue for lawyers to argue about, adding yet another layer of complication and expense to what should be a relatively simple inquiry. Apparently, every Miller Act trial must now feature dueling accountants.

The majority's distinction is also inconsistent with its ruling in this case. The items here at issue, it will be remembered, are replacement parts for heavy earth-moving and rock-crushing equipment, the type of equipment the majority seems to say is "obviously" capital. Why would the parts to something that is capital be deemed material? The only rational answer relates to consumption, not to the opinion of accountants.

This is a serious matter. The government has an interest in maintaining an ongoing relationship with contractors who perform well and who have managed to wend their way through the government's Byzantine contracting procedures. Government contracting is a beast of a different color, and those who battle it and triumph should be handed a medal not a ball and chain. The majority's rule will have the perverse effect of driving experienced contractors away from government work because their Miller Act premiums will become prohibitive. This makes no sense to me at all.

B. But we need not look quite so far into the future to see the majority opinion's ill effects; some will show up on remand. As the majority has structured its opinion, the parties will have to try the case under two inconsistent theories: a contract-by-contract approach for general Miller Act liability and the statute of limitations, and an aggregate approach for the material/capital distinction. I can't think of a way to complicate the problems of discovery or proof more perversely, or to confuse the judge and jury more thoroughly, than by adopting inconsistent theories on these closely related issues.

When crafting rules of law, appellate courts must attend to the very real problems of applying those rules in the crucible of litigation. Our law is complicated enough: We are almost to the point where federal jurors should be subject to dismissal for cause unless they answer yes to the question "Are you willing to disregard common sense in reaching a verdict?" Much of this complexity is unavoidable, as Congress passes laws that are increasingly complex and counterintuitive. See Stephen J. Adler, *Can Juries Do Justice to Complex Suits?*, Wall St J at B1 (Dec 21, 1989). But a substantial part of the problem can be laid at the doorstep of appellate judges who sometimes write opinions with all the common sense and practical wisdom of a law review article. But unlike law review articles, most of which, mercifully, are ignored by everyone involved in the workaday practice of law, impractical appellate opinions are like the proverbial crocodile in the bathtub: You can't ignore them and they immensely complicate the task at hand.

To be sure, lawyers and district judges learn to adjust to whatever convoluted rule the court of appeals imposes on them, but this adjustment is not cost-free. The more complicated and counterintuitive the rule, the more court time, the more client money, the more witness time will be consumed in resolving the dispute.[4] Litigation, which already eats up a hugely disproportionate share of our productive resources, sucks yet another quantum of energy from the vital business of producing goods and services. In my view, this is a poor bargain. We will come to grief as a nation if we continue the current trend of robbing Peter to pay Paul's lawyer. See P. Huber, *Liability: The Legal Revolution and Its Consequences* 153–71 (Basic, 1988).

Appellate judges have a vital role to play in regulating the degree of complexity—and therefore the cost—of our legal system. While we are bound by whatever Congress decrees in statutes, there are many occasions where we are called upon to craft a rule of law, either in interpreting the Constitution, or in performing our supervisory functions over the conduct of district court proceedings, or in common-law adjudication, or in drafting procedural rules; there are others. When performing that function, we must not give free reign to whatever rule happens to tickle our fancy.

Instead, we must, wherever possible, select the rule of law that advances fairness while diminishing the risk and cost of litigation; usually, they amount to the same thing. Thus, all things being equal, courts should favor a rule that respects the sanctity of written instruments, as such a rule promotes predictability and diminishes the

---

**4.** This case provides a good example. If all the issues in a Miller Act case center around a single contract, discovery and proof will be so limited. But if, in deciding whether supplies are capital one must look at a whole string of projects, the number of documents and witnesses that must be examined is concomitantly multiplied.

incentive to litigate. See *Trident Center v. Connecticut Gen'l Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir.1988). Similarly, courts should avoid creating vague new causes of action that invite parties and their lawyers to stalk lawsuits as if they were leprechauns. See *Oki America, Inc. v. Microtech Int'l, Inc.*, 872 F.2d 312, 316 (9th Cir. 1989) (Kozinski concurring). And, no less important, appellate judges should be mindful of the realities of litigation and avoid establishing rules of law that unnecessarily complicate the litigation process. See *United States v. Balough*, 820 F.2d 1485, 1491 (9th Cir.1987) (Kozinski & Hall concurring).

The approach the majority adopts runs afoul of this last axiom. With no explanation, and for no apparent reason, the majority creates a rule of law that requires the parties to litigate parallel legal issues by means of inconsistent legal theories. The majority no doubt prefers the rule it adopts, but is that a sufficient reason to impose this added burden on the district court, the lawyers and the parties? Even if it were the better rule—which I seriously doubt, for the reasons explained above— are we not also required to make sure it's worth the candle? Absent some statutory imperative, which does not exist here, I suggest there is a heavy presumption in favor of adopting the consistent and more easily litigable rule; a rule focusing entirely on a single contract, or its converse, focusing on all bonded contracts as a group, would do fine for this purpose. To adopt a hybrid rule, which will send the parties and the district court chasing every which way is not, in my view, consistent with principles of sound judicial administration. To reach out for such a rule in the teeth of contrary authority from every oth-

er circuit that has addressed the issue is wholly incomprehensible. The majority may believe that it has reached a Solomonic solution, but, like Solomon, they may have merely reached a result that satisfies the court's own sense of equity without genuine regard for whether its ruling makes sense.[5]

## Conclusion

Like every other court that adopts a broad and complicated rule, the majority predicts only modest consequences because of the "unique circumstances" of this case. Majority op at 549 n. 5. But there is nothing unique about this case; it's a run-of-the-Miller Act dispute. I doubt that the majority's disclaimer will deter many lawyers from pushing the majority's maverick rule to the limits of its logic.

The majority's rule runs counter to the rationale behind the Miller Act, and creates a conflict with at least three other federal circuits. Moreover, the rule will create needless confusion down the line. There is no explanation for any of this. When a court acts so contrary to ordinary reason, it must offer more justification than "[w]e do not demand that level of precision under the circumstances of this case." Majority op at 550. I respectfully dissent.

5. Solomon's own reputation as a man of justice is probably overrated. His resolution of the famed maternity dispute rests on the presumption that the baby's biological mother would be concerned about the life of the baby while the other woman would readily consent to its slaughter. Does this really make sense? As the story goes, the false mother was so grieved by the loss of her own baby that she stole that of another. 1 Kings 3:16–28. Would a woman in that situation countenance with indifference the killing of the very infant she had stolen to assuage her grief? In lieu of engaging in careful fact finding, Solomon may simply have handed the baby over to the woman who was clever enough to see through his bluff.

All of which is to say that Solomonic solutions may satisfy the Solomon in each of us, but do not necessarily reach the correct result. If Solomon's experience teaches anything, it is that courts must be extremely wary of adopting rules of law that satisfy the court's sense of justice but fail to take into account the realities of the dispute before them.